

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

| | |
|---|---|
| LHE:MEB/AS | *271 Cadman Plaza East* |
| F#: 2018R00035 | *Brooklyn, New York 11201* |

September 23, 2020

By Hand and ECF

The Honorable Margo K. Brodie
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Michael Hlady
                  Criminal Docket No. 20-008 (MKB)

Dear Judges Brodie:

        The government respectfully submits this letter, in advance of tomorrow's status conference, to request that the Court modify defendant Michael Hlady's bond based on his conduct while on pre-trial release. Hlady's history of fraud-related crimes goes back decades and includes a scheme he perpetrated against a group of nuns who ran a Catholic school. He committed that crime and the offense for which he is under federal indictment in much the same way: he pretended to be someone he is not. On pre-trial release in this case, he picked up where he left off. Since his release on bail, Hlady has used a cell phone application that allowed him to spoof his telephone number in an effort to defraud at least two victims. Hlady continued this conduct after persuading the government and Pre-Trial Services (through counsel) that he was too ill to wear an ankle bracelet electronic monitoring device. Hlady's conduct is egregious—particularly considering his past—and would normally warrant immediate bail revocation and remand. Under the circumstances surrounding the global pandemic, however, the government is only seeking a bail modification at this time.

I.      Background

        A.      The Hlady's Indictment and Pretrial Release

        Hlady and co-defendant Steven Nerayoff were arrested on a complaint on September 18, 2019 for extorting cryptocurrency from executive officers of a start-up company

identified as "Company 1" in the complaint and indictment. See Dkt. Entry No. 1, Compl. ¶¶ 23-28. In short, Nerayoff was the Chief Executive Officer of Alchemist, a company that purported to be a leading consultancy, accelerator and investment firm for high-potential blockchain companies. Id. ¶ 3. Nerayoff hired Hlady, who used the name "Michael Peters" and presented himself as a former member of the United States military, the Irish Republican Army, and a former government agent who had worked for the National Security Agency, the Federal Bureau of Investigation ("FBI") and the Central Intelligence Agency. Id. ¶¶ 4, 23. Together, Nerayoff and Hlady extorted individuals identified as John Doe and Jane Doe in the complaint and indictment.

In the first extortion scheme, from October 2017 through December 2017, Nerayoff threatened to destroy Company 1 by sabotaging its crowdsale—a critical online event for a startup cryptocurrency company raising funds—and generating negative press if it did not sign certain agreements allowing him to keep approximately $8.75 million worth of cryptocurrency. Id. ¶¶ 16-17. In the second extortion scheme, Nerayoff introduced victims to "Mike Peters" (i.e., Hlady) and told them that "Peters" should be viewed as the president of Nerayoff's company. Id. ¶¶ 23-28. In March 2018, Nerayoff demanded that Company 1 "loan" him cryptocurrency worth millions of dollars. Id. ¶ 23. Nerayoff and Hlady told the victims that "Peters" was a former agent who had been shot at, killed people, and "taken down" a head of state. Id. ¶ 23. That month, Jane Doe attended business meeting with Nerayoff and Hlady at Nerayoff's house. Id. Because of a snow storm, she could not fly out and stayed in one of Nerayoff's unoccupied rooms in the house. Id. In the middle of the night, Hlady walked into Jane Doe's room, turned on the lights, pulled up a chair to the bed, and told her that if Company 1 did not agree to Nerayoff's demands of $10 million and Company 1-issued cryptocurrency tokens, then the co-conspirators would crush Company 1. Id. ¶ 25.

In the ensuing days, Hlady and Nerayoff continued to threaten Jane Doe. At the end of March 2018, Hlady sent a message to Jane Doe in which he promised that he would "destroy your community" (i.e., Company 1's community) if she did not meet his and Nerayoff's demands. Id. ¶ 27. The message ended warning Jane Doe that she was "stalling for stalling's sake I will be landing in 4hrs I expect you and [John Doe] on the phone." Id. As a result of these threats, Company 1 paid Nerayoff and Hlady about $4.45 million in cryptocurrency. Id. ¶¶ 23, 28.

The defendants were indicted on January 10, 2020. Dkt. Entry No. 30. Because of his criminal past, detailed below, the government insisted that Hlady be released either on a bond secured by property or that he wear a monitoring bracelet. When Hlady was unable or unwilling to secure his bond by property, Hlady's bond was modified to include electronic monitoring. Dkt. Entry No. 24. Since then, the government has agreed to bond modifications and, when counsel represented that Hlady had medical setbacks, it agreed to temporarily remove electronic monitoring. Dkt Entry Nos. 17, 25, 47.

B.  Hlady's Criminal History

According to pre-trial reports, Hlady has been arrested 11 times between the ages of 20 and 45, most recently for being a fugitive from justice in Massachusetts; he was arrested in this case at age 47. Hlady has repeatedly benefited from lenient treatment, including for other

fraud-related offenses, such as larceny, obtaining money under false pretenses, and check-related fraud. His most serious prior offense was defrauding a group of nuns. Based on publicly available information[1] and Hlady's criminal history report, in approximately January 2010 Hlady promised several nuns who ran a small Catholic school that he could secure money to pay for millions of dollars in renovations for the school. As he has done throughout this life, Hlady made false promises, attempting to extract a fee from the nuns by promising that he had a wealthy donor who could cover all of the expenses for the renovations. He identified one such donor in particular—someone who had made similar donations in the past. Relying on Hlady's representations, the nuns hired contractors to begin the work. As it turned out, the supposed donor knew nothing about Hlady or his promises, which explained why Hlady had made repeated excuses as to why this donor could not meet with school representatives. Hlady ultimately admitted that it was all part of a fraudulent scheme, and that he did it to collect hundreds of thousands of dollars in fees. The contractors who had begun work demanded to be paid; the resulting settlement was funded by the nuns' retirement savings.

      Hlady expressed contrition to the state judge, saying that there was "no excuse for my actions." Although he was initially sentenced to probation, Hlady was incarcerated for violating the terms of his probation because he refused to make his restitution payments, which had been reduced to just $250 per month. Notably, at the time of his instant arrest, Hlady disclosed leasing two luxury vehicles, an Audi and BMW, for a combined $1,200 monthly lease payments. It appears that Hlady has never fully paid his restitution obligations.

      Despite this egregious fraud and Hlady's other arrests, the government believed that with electronic monitoring and a curfew, and under a federal indictment for extortion, Hlady would be sufficiently deterred from defrauding members of the community during the pendency of this case. It was wrong.

    C.     <u>Hlady's Criminal Activity While on Release</u>

      Earlier today, the FBI executed a search warrant of Hlady's home to obtain his cell phone, which Hlady has once again used to commit additional fraudulent offenses. The government was recently contacted by some of the victims of these schemes, perpetrated by Hlady while on pre-trial release, and its investigation is ongoing. Based upon the information the government has gathered to date, it is clear that the defendant has, at a minimum, violated the terms of his release.

      At this preliminary stage, the government has learned that while on pre-trial release, Hlady used a spoofing application on his phone, called "Burner App," that allowed him to mask his telephone number, so that it appeared to the person with whom he was speaking or exchanging text-messages that Hlady had a different phone number, with any area code Hlady

---

[1] See, e.g., https://boston.cbslocal.com/2011/06/27/man-who-swindled-worcester-nuns-sentenced-to-prison/ and https://www.telegram.com/article/20160114/NEWS/160119498; https://www.bostonherald.com/2010/04/02/ag-scammer-preyed-on-trusting-nuns/; http://archive.boston.com/news/local/massachusetts/articles/2010/04/02/ri_man_charged_in_scam_at_worcester_school/

wished to use. Hlady used this application to, once again, pretend to be someone he was not in order to extract money from people. The government is aware of two potential victims.[2]

The first victim is an elderly man who walks with the aid of a cane ("Victim 1"). Hlady told Victim 1 that Hlady had connections in the Food and Drug Administration ("FDA") to help Victim 1 promote a product he believed could help cancer patients, and recommended that Victim 1 hire an attorney who specialized in dealing with the FDA. Hlady gave Victim 1 the telephone number for this purported attorney while insisting that he be the one who collected the legal fee. As it turns out, that attorney does not exist. The phone number Hlady gave to Victim 1 for a supposedly well-connected FDA lawyer was one Hlady picked on his Burner App. To make the lie more convincing, Hlady selected a number with a 202-area code, i.e., the area code associated with Washington D.C. (the "202 Telephone Number"), which would make the lawyer's purported ties to the FDA more believable.

Records pertaining to Hlady's Burner App usage reveal that he had a system by which he organized his multiple ruses. Each of his multiple fake numbers was labeled with the first name of the victim associated with that number. This would allow him to know which of his multiple personas he should use in conversations with each of his victims, and ensure that he did not use the wrong fake identity with a victim. In the Burner App, Hlady listed the 202 Telephone Number next to the first name of Victim 1.

Next, Hlady used the Burner App to impersonate another individual, "Victim 2," who is a prominent businessman and philanthropist. Hlady selected a number to use when pretending to be Victim 2 that had an area code which matched the region where Victim 2 is publicly known to reside. Following his own script from his fraud of the nuns, Hlady told a representative of a company ("Company 2") that had been engaged in a certain venture that he had recruited Victim 2 to help with this venture, and that Victim 2 was even willing to serve as part of an "interim leadership team." The telephone number Hlady provided to Company 2 for Victim 2 was also found in Hlady's Burner App, next to Victim 2's first name. Victim 2 does not know Hlady, is not associated with the number Hlady used for him, and was disturbed to learn from Company 2 that Hlady was using Victim 2's name in connection with this venture.

II.     Discussion

    A.     Applicable Law

Title 18, United States Code, Section 3148 governs revocation of bail. Pursuant to 18 U.S.C. § 3148(a), "[a] person who has been release[d] under [18 U.S.C. § 3142] and who has violated a condition of his release, is subject to a revocation of release, an order of detention, and a prosecution for contempt of court." 18 U.S.C. § 3148(a). A proceeding

---

[2] "It is well established that the Government may proceed by proffer at a bail revocation hearing" and "this Court has also concluded that bail revocation hearings are 'typically informal.'" United States v. Brooks, 872 F.3d 78, 84 n.11 (2d Cir. 2017) (collecting authority).

for revocation of an order of release may be initiated by the government "by filing a motion with the district court." Id.[3]

Section 3148(b) provides that a court "shall" revoke bail and detain a defendant if two conditions are met.[4] First, the court finds either "probable cause to believe that the person has committed a Federal, State, or local crime while on release" or "clear and convincing evidence that the person has violated any other condition of release." 18 U.S.C. § 3148(b)(1)(A), (B). Second, the court must determine that either the person is "unlikely to abide by any condition or combination of conditions of release," or there is no combination of conditions of release that would guarantee the defendant's appearance or the safety of the community. 18 U.S.C. § 3148(b)(2)(A), (B). See generally, United States v. Gotti, 794 F.2d 773, 776 (2d Cir. 1986).

Notably, "probable cause for purposes of § 3148(b)(1), does not mean "more likely true than false" that a defendant committed a crime; rather, "facts available" to the court must support "'a man of reasonable caution in the belief' that the defendant has committed a crime while on bail." Gotti, 794 F.2d at 777 (quoting Texas v. Brown, 460 U.S. 730, 742 (1983)). See Brown, 460 U.S. at 742 (explaining that probable cause means a "practical, nontechnical probability" and there is no requirement that "such a belief be correct or more likely true than false"). Once the court finds probable cause to believe that a defendant committed a crime, the defendant may be "detained upon a finding, by only a preponderance of the evidence, that no conditions of release will guard against flight or dangerousness or that the person is unlikely to abide by any release condition." Id. Thus, Section 3142(f) notwithstanding, the "dangerousness" prong of revocation need not be proven by clear and convincing evidence. Id.

The Court may revoke a defendant's bail without holding a hearing where the Court makes a probable cause finding on the record before it. See United States v. Galanis, 656 F. App'x 560, 562 (2d Cir. 2016) (summary order) (affirming the district court's revocation of bail without an evidentiary hearing, finding that the district judge "acted within his discretion in proceeding based on the government's proffer and his review [of the evidentiary record]"). A district court's decision to remand a defendant pursuant to Section 3148(b) is affirmed unless its

---

[3] Section 3148(b) also provides that "[t]o the extent practicable . . . [the defendant] shall be brought before the judicial officer who ordered the release and whose order is alleged to have been violated." Because the Honorable Steven L. Tiscione ordered Scarpa's release (on the government's consent), this letter is addressed to him in addition to the assigned district court judge.

[4] Title 18, Section 3142(b) states that to, "To the extent practicable, a person charged with violating the condition of release that such person not commit a Federal, State, or local crime during the period of release, shall be brought before the judicial officer who ordered the release and whose order is alleged to have been violated." Because the Court is holding a status conference in this case tomorrow and because the Court has previously modified Hlady's bail conditions, the government is submitting this letter to Your Honor.

findings were clearly erroneous or the Court committed an error of law. United States v. LaFontaine, 210 F.3d 125, 130 (2d Cir. 2000).

 B. Analysis

 With the government's consent, Hlady was permitted to remain on bond despite his long history of arrests, including as a fugitive from justice. It is now clear that even a federal indictment and pre-trial supervision cannot protect the public from Hlady, who appears to be incorrigible. Throughout his time on pre-trial release, Hlady has been using the Burner App to trick people into believing he had some extraordinary connections—much in the same way he defrauded the nuns and extorted the victims in his federal case.

 The government is investigating whether, with respect to Victim 1, Hlady committed wire fraud, in violation of 18 U.S.C. § 1343, and Hobbs Act extortion, in violation of 18 U.S.C. § 1951(a), based on certain statements made to that victim. As to Victim 2, the government is investigating charges based on wire fraud, access device fraud, in violation of 18 U.S.C. 1028(a)(7) (criminalizing the use of a "means of identification" of another person in furtherance of a federal or state offense), and aggravated identity theft, in violation of 18 U.S.C. § 1028A. Hlady's conduct likely violated state criminal laws as well, such as New York Penal Law § 190.25, prohibiting criminal impersonation. [5]

 Two features of Hlady's conduct make it particularly disturbing. *First*, it persisted for many months, including during the time when he claimed that he was bedridden and could not wear a GPS ankle bracelet.[6] Indeed, as the Court can see in a recording relating to the Burner App, see Exhibit A, at 61, Hlady created the fake number for Victim 2 in February 5, 2020 and began using it almost immediately—and incessantly—until mid-August of 2020, the same time that one of his victims reported him to the government. Id. at 11. *Second*, records relating to Hlady's Burner App show a heavy volume of activity and more than a dozen other fake numbers; he assigned some of these numbers other names, i.e., people who could be

---

 [5] Section 190.25 states, in relevant part, that a person is guilty of the crime when he:

> 1. Impersonates another and does an act in such assumed character with intent to obtain a benefit or to injure or defraud another; or
> 2. Pretends to be a representative of some person or organization and does an act in such pretended capacity with intent to obtain a benefit or to injure or defraud another; or
> 3. [omitted]
> 4. Impersonates another by communication by internet website or electronic means with intent to obtain a benefit or injure or defraud another, or by such communication pretends to be a public servant in order to induce another to submit to such authority or act in reliance on such pretense.

 [6] The government is investigating whether Hlady wanted the bracelet removed to allow him freedom of movement in furtherance of his recent criminal activity.

6

other potential victims.[7] The government is continuing to investigate whom else Hlady may have defrauded.

        Under normal circumstances, the government would ask the Court to revoke Hlady's bond and remand him, and it reserves the right to do so if it brings additional charges against Hlady.  At this point, however, given the ongoing pandemic, the government asks that the Court restrict Hlady's bail conditions to make it more difficult for Hlady to continue defrauding others.  Accordingly, the government respectfully requests that Hlady's bond be modified to provide for home confinement, with electronic monitoring and to impose a special condition that he not have access to any internet-enabled electronic devices, as well as any other conditions recommended by Pre-Trial Services.

III.    Conclusion

        For the reasons above, the government respectfully submits that the Court should modify Hlady's bond.

Respectfully submitted,

SETH D. DuCHARME
Acting United States Attorney

By:        /s/
      Mark E. Bini
      Andrey Spektor
      Assistant U.S. Attorneys
      (718) 254-6700

cc:    Defense Counsel of record (by ECF)
       Clerk of the Court (MKB) (by ECF)
       Pretrial Services (by Email)

---

[7] The government is attaching, under seal, as Exhibit B, some of the records it has received for Hlady's Burner App, which shows telephone numbers ending with 2086 and 5928 as the ones that Hlady selected for, respectively, those purportedly associated with the FDA-connected lawyer and the Victim 2.  The exhibit is filed under seal because Hlady used Victim 1's and Victim 2's first names within the Burner App.