UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------x

UNITED STATES OF AMERICA,

       -against-                      Case No. 1:20-cr-00008 (MKB)


STEVEN NERAYOFF,

--------------------------------------------------x


**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT STEVEN NERAYOFF'S PRETRIAL MOTION
TO DISMISS THE INDICTMENT, DISCLOSE PORTIONS OF THE
GRAND JURY PROCEEDINGS AND COMPEL DISCOVERY
FROM THE GOVERNMENT**


Michael A. Scotto
1225 Franklin Ave, Suite 325
Garden City, NY 11530
(516) 506-2302
mascottoesq@gmail.com


i

# TABLE OF CONTENTS

Preliminary Statement ............................................................................................ 1

Summary of Relevant Facts .................................................................................... 2

    Mr. Nerayoff is engaged to assist Company 1 with an ICO ................................. 2

    The Grand Jury Proceedings ............................................................................ 4

Argument ............................................................................................................... 5

Point I .................................................................................................................... 5

The Indictment Should Be Dismissed With Prejudice As It Rests On Materially False
Testimony Regarding Mr. Nerayoff's Dealings With Company 1, Jane Doe And John Doe
And Thus Violates The Due Process And Grand Jury Clauses Of The Fifth Amendement ....... 5

Point II ................................................................................................................. 10

Pursuant To Fed. R. Crim. P. 6(e)(3)(E)(ii) The Court Should Order Disclosure Of Those
Portions Of The Grand Jury Minutes Necessary To The Resolution Of Defendant's Motion Or
In The Alternative Conduct An In Camera Review ................................................. 10

Point III ............................................................................................................... 12

The Court Should Order The Government To Provide Information Defendant Has Requested
Under Rule 16 And This Court's Rule 5(f) Order As The Information Sought Is Material To
The Defense Of This Action And The Resolution Of This Motion ......................... 12

Conclusion ........................................................................................................... 22

# TABLE OF AUTHORITIES

## Cases

*Anilao v. Spota*, 981. F.Supp.2d 157, 172 (E.D.N.Y.) ........................................................... 11

*Brady v. Maryland*, 373 U.S. 83 (1963) ................................................................................ 16

*Daniel v. Williams*, 474 U.S. 327, 331 (1986) ........................................................................ 8

*Dole v. Williams Enterprises, Inc*, 876 F.2d 186, 188, n.2 (D.C. Cir. 1989) ............................ 16

*Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 222 (1979) .................................... 10

*Giglio v. United States*, 405 US 150 (1972) ............................................................................. 8

*Morse v. Fusto*, 804 F.3d 538, 547 (2nd Cir. 2015) ................................................................. 8

*Nova Scotia v. United States*, 487 U.S. 250, 264 (1988) ........................................................... 9

*Salinas v. Texas*, 570 U.S. 178 (2013) ................................................................................... 13

*United States v. Basurto*, 497 F.2d 781 (9th Cir. 1974) ............................................................ 7

*United States v. Burhoe*, 871 F.3d 1 (1st Cir. 2017) ................................................................. 4

*United States v. Calandra*, 414 U.S. 338, 342-343 (1974) ........................................................ 6

*United States v. Clemente*, 640 F. 1069 (2d Cir. 1981) ............................................................. 4

*United States v. Flores*, 888 F.3d 537, 545 (D.C. Cir. 2018 ................................................... 14

*United States v. Goldman*, 451 F.Supp.518 (SDNY 1978, Duffy, J.) ......................................... 7

*United States v. Guillette*, 547 F.2d 743 (2nd Cir. 1976) ........................................................... 7

*United States v. Hendrickson*, 26 F.3d 321, 333 (2d Cir. 1994) .............................................. 17

*United States v. Jackson*, 180 F.3d 55 (2d Cir. 1999) ............................................................... 4

*United States v. Jimenez Recio*, 537 U.S. 270, 274 (2003) ........................................................ 4

*United States v. Laurent*, 861 F.Supp.2d 71, 89 (E.D.N.Y. 2011) ............................................ 9

*United States v. Leung*, 40 F.3d 577, 581 (2d Cir. 1994) ........................................................ 10

*United States v. Orlando*, 819 F.3d 1016 (7th Cir. 2016) .......................................................... 4

*United States v. Procter & Gamble Co*., 356 U.S. 677, 682 (1958) ..................................... 10, 11

*United States v. Sturm*, 870 F.2d 769 (1st Cir. 1989) ............................................................... 4

*United States v. Torres*, 901 F.2d 205 (2nd Cir. 1990) ............................................................. 8

*United States v. Williams*, 504 U.S. 36 (1992) ....................................................................... 9

*Zahrey v Coffey*, 221 F.3d 342, 349 (2nd Cir 2000) ................................................................. 8

## Statutes

18 U.S.C. § 1001 ................................................................................................................. 5

18 U.S.C. § 1621 ................................................................................................................. 5

18 U.S.C. § 1951(b)(2) ........................................................................................................ 4

42 U.S.C. § 1983 ................................................................................................................. 8

F.R.E. 801(d)(1)(B)(i) ....................................................................................................... 13

Federal.Rule of.Criminal. Procedure 16(E)(i) ..................................................................... 21

Federal Rule of Criminal Procedure 16 .............................................................................. 16

Federal Rule of Criminal Procedure 6(e)(3)(E)(ii) .............................................................. 10

## Other Authorities

Office of the Inspector General U.S. Department of Justice Report of Investigation of Text Messages from Certain FBI Mobile Devices ....................................................................................... 15

Regulations

Department of Justice Guidelines Regarding the Use of Confidential Informants, January 8, 2001 ......... 15

Defendant Steven Nerayoff ("Mr. Nerayoff") respectfully submits this Memorandum of Law in support of his motions to: (i) dismiss the indictment against him with prejudice as the alleged extortion charges are entirely based upon falsehoods advanced by the alleged victims and the government knew, or should have known, that the evidence upon which the indictment was based was perjurious; (ii) disclose portions of the Grand Jury minutes that relate to Mr. Nerayoff's dealings with the alleged victims which falsely support the indictment; and (iii) compel the government to provide further discovery under Rule 16 and this Court's December 10, 2020 5(f) order in response to Mr. Nerayoff's July 18, 2022 and January 23, 2023 requests.

## PRELIMINARY STATEMENT

It is undisputed that an indictment cannot rest on materially false evidence, but in the case before the Court, falsehoods that are evident from the undisputed video recordings and other evidence submitted in support of this motion, most of which originate from government's own discovery, clearly establish that the indictment of Mr. Nerayoff is entirely based upon materially false information presented to the Grand Jury regarding the parties' relationship, their business negotiations and Mr. Nerayoff's absolute entitlement to the property he is alleged to have extorted and that the government knew, or should have known, of these falsehoods.

Defendant respectfully requests that should the Court decline to dismiss the indictment against Mr. Nerayoff with prejudice, the Court order the release of grand jury testimony relating to evidence presented relating to the alleged extortion and to compel the government to produce the information sought by Mr. Nerayoff and to allow him to renew and supplement the motion to dismiss the indictment based on a review of the grand jury testimony and information sought and to bring any additional applicable motions.

## SUMMARY OF RELEVANT FACTS

**Mr. Nerayoff is engaged to assist Company 1 with an ICO**

The Declaration of Michael Scott ("Declaration") in support of Mr. Nerayoff's motion establishes that his dealings with John Doe, Jane Doe and Company 1 were entirely lawful. (See, accompanying Declaration at ¶¶ 17-33, and 47-78, hereinafter "Decl. at ¶__"). In particular, it is beyond dispute that the July 22, 2017 agreement was renegotiated, not because Mr. Nerayoff wanted to extort additional consideration as the government has alleged, but because the parties had entered into it based on a mutual misunderstanding of its terms (Decl. at ¶¶17-18 and Exhibits 8, 9 and 10). It is also beyond dispute that the parties new November 7, 2017 agreement was the result of a cordial and friendly meeting run by Jane Doe and represented the parties' meeting of the minds as reflected in the November 6, 2017 Skype video recording and Jane Doe's email of the new terms after the meeting concluded. (Decl. at ¶¶ 19-31 and Exhibits 11-12, 15-22). This agreement was memorialized in the "Services Payment Agreement" between the parties (Exhibit 21). As the Skype video shows, the re-negotiations the parties engaged in on November 6, 2017 were cordial, cooperative and the parties agreement was not the result of threats of any kind (Exhibits 18-19).

It is additionally beyond dispute that after the crowdsale concluded on December 7, 2017, that Company 1 refused to give Mr. Nerayoff any of the 1.35 billion tokens it owed him, but rather Company 1, as directed by John Doe and Jane Doe, held those tokens and the additional 900,000,000 tokens due Mr. Nerayoff in Company 1's public wallet. (Decl. at ¶32, Exhibit 29). It also beyond dispute that Mr. Nerayoff made repeated requests for Company 1 to provide him the 1.35 billion tokens due to him under the November 6, 2017 agreement, as well as the "loyalty reward tokens" Mr. Nerayoff was entitled to, but John Doe and Jane Doe refused to abide by the

terms of the November 6, 2017 agreement and continue to do so to date.   It is also beyond dispute

that on March 20, 2018, after continuing to refuse to provide any of Mr. Nerayoff's tokens, John

Doe messaged Mr. Nerayoff and suggested that Company 1 might be able to provide Mr. Nerayoff

with a 'loan' in order to give him something of value for the tokens that Company 1 refused to

release to him (Decl. at ¶¶47, 50-52, 55, and 57 and Exhibit 29).

It is beyond dispute that on the evening of March 27 into the early morning hours of March

28, during an extended conference call between Mr. Nerayoff, Jane Doe, John Doe and Hlady, Mr.

Nerayoff told Company 1 that he would sue Company 1 for breach of contract if they wouldn't

give them his tokens, but ultimately he agreed to accept the 10,000 Ether 'loan' until such time as

they could issue him his tokens (Decl. at ¶¶ 57-58, 60, Exhibits 33 and 34).   It is also beyond

dispute that Company 1 did provide Mr. Nerayoff with the 10,000 Ether 'loan,' which was secured

by 70,000,000 out of the over 2,350,000,000 tokens owed to him, as a result of the "threat" to

commence a lawsuit, a lawsuit that Nerayoff engaged a firm to draft in the spring of 2018 (Decl.

at  ¶55, nt. 57), but also because Company 1 was able to extract  harsh terms that Mr. Nerayoff

had to accept-in order to receive only a small fraction of the value of his holdings: Mr. Nerayoff

was required to waive 350 million loyalty program tokens he was due, thus Company 1 made

approximately $10 million as a result of the surrender of Mr. Nerayoff's rights to those 350 million

tokens  (Decl. at ¶¶ 61-63)

Finally, as the Company 1 documents used as exhibits in support of Mr. Nerayoff's  actual

innocence of the charges were provided by Company 1 sometime in February of 2019– a full seven

months before S/A Anderson obtained a warrant to arrest Mr. Nerayoff–it is clear that the

government possessed evidence which showed that November 7, 2017 agreement was not entered

into as a result of any coercion, but rather it was the product of a mutually agreed upon, entirely

3

voluntarily renegotiation and that all Mr. Nerayoff's dealings with Company 1 and its executives were entirely lawful.

## **The Grand Jury Proceedings**

Mr. Nerayoff is charged in a four-count indictment with, Conspiracy to commit Extortion under the Hobbs Act (count 1), Hobbs Act Extortions (count 2 and count 3) and Conspiracy to Transmit Interstate Communications with Intent to Extort (count 4).

While we are not in possession of the transcript of the grand jury proceedings, given the requirement that the grand jury hear evidence of those actual threats and the wrongfulness of Mr. Nerayoff's demands, logic dictates that we must conclude that the government did indeed present evidence to the grand jury that Mr. Nerayoff had no claim of right to obtain property in connection with the entirety of his dealings with Company 1 and that he obtained such property through wrongful threats as the government alleged in the complaint, press release[1] and indictment.[2]

---

[1] See, https://www.justice.gov/usao-edny/pr/two-arrested-extortion-startup-cryptocurrency-company

[2] To act with "intent to extort" means to act with the intent to obtain property from another, with the victim's consent, but where that consent was "induced by wrongful use of actual or threatened force, violence, or fear . . . ." 18 U.S.C. § 1951(b)(2).  While, there is absolutely no credible evidence that Mr. Nerayoff authored or directed that March 28 text be sent, or in any way aided, counsel, commanded, induced or procured the sending of the text, or engaged in a conspiracy to commit extortion of any sort or indeed any crime, even if he had so engaged Mr. Nerayoff had a claim of right and any threats to institute litigation to pursue that claim are not lawful as a matter of firmly established precedence. *United States v. Jackson*, 180 F.3d 55 (2d Cir. 1999); *United States v. Clemente*, 640 F. 1069 (2d Cir. 1981); *United States v. Burhoe*, 871 F.3d 1 (1st Cir. 2017); *United States v. Orlando*, 819 F.3d 1016 (7th Cir. 2016); *United States v. Sturm*, 870 F.2d 769 (1st Cir. 1989).  Similarly given the overwhelming evidence of Mr. Nerayoff's claim of right, it is clear that there could be no conspiracy as it the law is clear that "the essence of a conspiracy is "an agreement to commit an unlawful act." *United States v. Jimenez Recio*, 537 U.S. 270, 274 (2003). The evidence submitted in support of this motion clearly establishes that Mr. Nerayoff's only goal in his dealings with Company 1 was to engage in lawful commerce and not be cheated by Company 1, John Doe and Jane Doe.  This is the case notwithstanding Hlady's plea allocution in which he averred that Mr. Nerayoff did not have a claim of right and engaged in a conspiracy to extort money from Company 1, John Doe and Jane Doe.  Of course, Hlady's plea allocution which has no evidentiary value and is inadmissible for any purpose at a trial is also clearly contrary to what actually occurred.  While we can speculate as to why Hlady so pleaded, whatever his motive the simple fact that he admitted to a crime which he could not have legally committed does not change the facts that Mr. Nerayoff has established that the indictment against him rests on material falsehoods and perjured testimony.

As displayed in the attached Declaration and supporting exhibits, the undisputed documentary and video evidence submitted in support of this motion clearly establishes that Mr. Nerayoff's business dealings with John Doe, Jane Doe and Company 1 were entirely lawful and indeed cordial and that the parties spent considerable time together socializing and attempting to advance the affairs of Company 1 and that government was aware these facts since at least February of 2019.

Thus the evidence presented to the grand jury that Mr. Nerayoff extorted or conspired to extort anything from Jane Doe, John Doe and Company 1, is obviously false and perjurious – it doesn't matters whether John Doe or Jane Doe testified falsely to the grand jury or if their false accounts were recounted to government officials who relayed the false testimony to the Grand Jury – the testimony upon which this indictment rests is based upon a false, perjurious narrative which went to the very nature of Mr. Nerayoff's lawful business activity with the so called victims, falsehoods which the government knew, or at minimum should have known, were in fact false.[3]

## ARGUMENT

### POINT I

**THE INDICTMENT SHOULD BE DISMISSED WITH PREJUDICE AS IT RESTS ON MATERIALLY FALSE TESTIMONY REGARDING MR. NERAYOFF'S DEALINGS WITH COMPANY 1, JANE DOE AND JOHN DOE AND THUS VIOLATES THE DUE PROCESS AND GRAND JURY CLAUSES OF THE FIFTH AMENEDMENT**

Almost fifty years ago, the Supreme Court stated, "[t]he institution of the grand jury is deeply rooted in Anglo-American history.  In England, the grand jury served for centuries both as a body of accusers sworn to discover and present for trial persons suspected of criminal

---

[3] If either of the alleged victims falsely provided this information to Agent Anderson, they would be guilty of providing false statements in violation of 18 U.S.C. § 1001. Whomever testified in the grand jury knowing that the statements were materially false would be guilty of perjury under 18 U.S.C. § 1621, as would Agent Anderson if he knowingly swore to the truth of the statements contained in the complaint.

wrongdoing and as a protector of citizens against arbitrary and oppressive governmental action. In this country the Founders thought the grand jury so essential to basic liberties that they provided in the Fifth Amendment that federal prosecution for serious crimes can only be instituted by 'a presentment or indictment of a Grand Jury.'" *United States v. Calandra*, 414 U.S. 338, 342-343 (1974). As such, even though a facially valid indictment is not subject to independent inquiry into the adequacy and competency of the evidence upon which it is based, due process nevertheless imposes certain restrictions on the type of evidence that a grand jury may properly act upon. One such restriction is if the evidence before the grand jury was materially false.

While concededly, Mr. Nerayoff is not privy to what evidence the grand jury received, there is a wealth of information regarding the government's theory of the case, the allegations contained in both the Complaint and Indictment, which serve as a road map to the prosecution's case and the evidence that the grand jury must have received in order to return the indictment that Mr. Nerayoff obtained and conspired to obtain property via extortion.  Here, the road map laid out by the government leads to the inescapable conclusion that each of the counts of the indictment rest on false and perjured testimony as the indisputable facts are:

> i) there was no extortion or conspiracy to extort the alleged victims;
>
> ii) in order for the grand jury to return an indictment charging extortion and extortion conspiracy it needed to receive evidence that the victims were extorted and the existence of a conspiracy to extort; and
>
> iii) the grand jury returned an extortion conspiracy and extortion indictment.

The evidence in support of this motion establishes that here, the indisputable evidence shows that the entirety of Mr. Nerayoff's dealings with Company 1 and its executives, Jane Doe and John Doe, were entirely lawful and that the government knew as much at least as early as February 2019, almost a year before they obtained the indictment against Mr. Nerayoff.

6

Consequently, if in order to obtain an indictment the government was required to submit evidence that Mr. Nerayoff's dealings were in fact unlawful, testimony that Mr. Nerayoff extorted anyone is indisputably and objectively false and a review of the minutes relating to those falsehoods will directly support Mr. Nerayoff's motion to dismiss. The falsehoods at issue here did not amount to a difference between shades of gray – they go to the core of the government's case – and they are material to every count in the Indictment.

In *United States v. Basurto*, 497 F.2d 781 (9th Cir. 1974), the 9th Circuit held that "the Due Process Clause of the Fifth Amendment is violated when a defendant has to stand trial on an indictment which the government knows is based partially on perjured testimony, when the perjured testimony is material." *Id.* at 785-786. In *Basurto*, the 9th Circuit further ruled that in such a case, "the prosecutor [should] return to the grand jury and seek a new indictment untainted by the perjury." *Ibid.* In reaching this conclusion, the 9th Circuit noted permitting an accused "to stand trial when the prosecutors knew of the perjury before the grand jury only allowed the cancer to grow." *Id.* at 785.

While the only reported case in this Circuit to dismiss an indictment based on the *Basurto* doctrine is *United States v. Goldman*, 451 F.Supp.518 (SDNY 1978, Duffy, J.), there the court looked to *United States v. Guillette*, 547 F.2d 743 (2nd Cir. 1976) as well as the Ninth Circuit's ruling *Basurto* to reach that decision. In *Guillette* the 2nd Circuit noted that while an indictment returned by a legally constituted and unbiased grand jury is generally not subject to attack on the ground that it is based on inadequate or incompetent evidence, the 2nd Circuit also acknowledged, that "[t]he government, however, is subject to certain restrictions on its relationship with the grand jury and the type of evidence it may present to obtain an indictment." *Id.* at 752. The Second Circuit explained further that:

> For example, where the government knows that perjured testimony has been given to the grand jury and that this testimony is material to the grand jury's deliberations, due process requires that the prosecutor take such steps as are necessary to correct any possible injustice. *United States v. Basurto*, *supra*. Where jeopardy has not yet attached, it generally is proper for the prosecutor to return to the grand jury and seek a new indictment untainted by the perjury.

*Id*. at 752-753. In *United States v. Torres*, 901 F.2d 205 (2nd Cir. 1990) the 2nd Circuit, while ultimately declining to dismiss the indictment on the record before it, also referenced the 9th Circuit's holding in *Basurto* explaining, "[g]iven the absence of any claims of prosecutorial misconduct or perjury with respect to the grand jury proceedings, there is simply no basis to consider applying *Basurto* here." *Id*. at 233.  There is no reason to believe that the 2nd Circuit would not apply the *Basurto* standard to an appropriate case, particularly since in the context of 42 U.S.C. § 1983 actions, the 2nd Circuit has held that "notwithstanding the legally permissible one-sided nature of grand jury proceedings, everyone possesses the additional and distinct right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigative capacity." *Morse v. Fusto*, 804 F.3d 538, 547 (2nd Cir. 2015), *quoting Zahrey v Coffey*, 221 F.3d 342, 349 (2nd Cir 2000).

In *Daniel v. Williams*, 474 U.S. 327, 331 (1986), the Supreme Court reminded us that "…the Due Process Clause, like its forebear the Magna Carta…was intended to secure the individual from the arbitrary exercise of the power of the government"(internal citations and quotations omitted).  In the Criminal Justice setting one cannot envision many more arbitrary exercises of government power than taking a person to trial on an indictment that the government knows was based entirely on false and perjurious testimony. *Id*. at 331.  Indeed, in *Giglio v. United States*, 405 US 150 (1972) the Supreme Court also wrote "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of

justice." *Id.* at 153 (internal quotation and citations omitted).

For all these reasons, Mr. Nerayoff respectfully asks the Court to dismiss the Indictment against Mr. Nerayoff, with prejudice, as it is uncontroverted that prior to obtaining the Indictment the government had extensive evidence in its possession that Mr. Nerayoff was entitled to billions of Company 1's tokens based on the <u>freely negotiated</u> November 7, 2017 agreement which the parties mutually entered into based on documents in the government's possession as early as February of 2019 – seven months before the arrest warrant was obtained in this case and eleven months before obtaining the instant indictment.

Justice Scalia's majority opinion in *United States v. Williams*, 504 U.S. 36 (1992), which held that a court cannot require the prosecution to present exculpatory evidence to the grand jury does not require a different result. Here, the error was not merely the failure to present exculpatory material to the grand jury, it was the <u>submission of false and perjurious testimony to the grand jury</u>. Two years prior to his opinion in *Williams*, Justice Scalia's concurrence in Bank of *Nova Scotia v. United States*, 487 U.S. 250, 264 (1988) noted, "I agree that every United States court has an inherent supervisory authority over the proceedings conducted before it, which assuredly includes the power to decline to proceed on the basis of an indictment obtained in violation of the law…" *Id.* at 264. Mr. Nerayoff respectfully submits that prosecution by an indictment based solely on perjurious testimony is a fundamental violation of both his due process and grand jury rights contained in the Fifth Amendment and is repugnant to the values espoused in the Constitution.

"While it may be true that "a grand jury might indict a ham sandwich" if asked to do so by a prosecutor," (*see United States v. Laurent*, 861 F.Supp.2d 71, 89 (E.D.N.Y. 2011), the Constitution doesn't require us to eat one made with tainted meat.

## POINT II

**PURSUANT TO FED. R. CRIM. P. 6(e)(3)(E)(ii) THE COURT SHOULD ORDER DISCLOSURE OF THOSE PORTIONS OF THE GRAND JURY MINUTES NECESSARY TO THE RESOLUTION OF DEFENDANT'S MOTION OR IN THE ALTERNATIVE CONDUCT AN IN CAMERA REVIEW**

Although Mr. Nerayoff believes that he has sufficiently established that the evidence before the Grand Jury was perjurious and that the government knew, or should have known this fact, and that the Court should dismiss the Indictment on that basis, if the Court does not so find, Defendant requests that the Court order disclosure of those portions of the Grand Jury minutes which relate to the false and perjurious testimony that Mr. Nerayoff believes must have been introduced in order for the Grand Jury to return the Indictment and provide him an opportunity to renew and supplement the motion to dismiss.

In particular, Federal Rule of Criminal Procedure 6(e)(3)(E)(ii) provides that a court may authorize disclosure of a grand jury matter "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." The Supreme Court has ruled that a defendant seeking disclosure of grand jury materials must show that the material it seeks "is need to avoid a possible injustice, that the need for disclosure is greater than the need for continued secrecy, and that his or her request is structured to cover only material so needed." *Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 222 (1979).  While to be sure, Defendant Nerayoff "must satisfy a heavy burden of showing that 'compelling necessity' outweighs countervailing public policy in order to disturb the presumption of the 'indispensable secrecy of grand jury proceedings,'" (*United States v. Procter & Gamble Co.*, 356 U.S. 677, 682 (1958)), and acknowledges that a "presumption of regularity attaches to grand jury proceedings," (*United States v. Leung*, 40 F.3d 577, 581 (2d Cir. 1994)), and specific factual allegations are required to permit a review of grand jury proceedings,  *Id.* at 582, we believe that the facts in this

case, the extensive proof of perjury, more than met those burdens.

Specifically, in this case, there is indisputable evidence that Mr. Nerayoff's dealings with Company 1 and its executives were entirely lawful and that the government knew as much at least as early as February 2019 – almost a year before they obtained the indictment against Mr. Nerayoff. It is self-evident that in order to obtain an indictment for extortion, the government was required to submit evidence showing that Mr. Nerayoff's dealings were in fact unlawful. However, the uncontroverted evidence establishes that any testimony that Mr. Nerayoff extorted anyone is indisputably and objectively false and a review of the minutes relating to those falsehoods will directly support Mr. Nerayoff's motion to dismiss.

Although "[t]he Supreme Court has enumerated the following reasons for grand jury secrecy (1) to prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subordination of perjury or tampering with the witnesses who may testify before the grand jury and later appear at trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to prevent innocent accused who is exonerated from disclosure of the fact that he was under investigation, and from the expense of standing trial where there was no probability of guilt." *Anilao v. Spota*, 981. F.Supp.2d 157, 172 (E.D.N.Y.), citing *United States v. Procter & Gamble Co*, 356 U.S. 677, 681, n6 (1958). None of the factors enumerated by the Supreme Court militate against disclosure. Indeed, disclosure will prevent an innocent accused from the having to standing trial where there is no probability of guilt.

11

**POINT III**

**THE COURT SHOULD ORDER THE GOVERNMENT TO PROVIDE INFORMATION DEFENDANT HAS REQUESTED UNDER RULE 16 AND THIS COURT'S RULE 5(f) ORDER AS THE INFORMATION SOUGHT IS MATERIAL TO THE DEFENSE OF THIS ACTION AND THE RESOLUTION OF THIS MOTION**

Although Defendant Nerayoff believes that he has sufficiently established that the evidence before the Grand Jury was false and perjurious and that this Court should dismiss the indictment on that basis, if the Court does not so find, Mr. Nerayoff respectfully requests that the Court order the government to provide certain information previously requested by his counsel which we believe is material to the defense of this action and an opportunity to renew and supplement the motion to dismiss based upon a review of that material.

As displayed in the attached Declaration, during the investigation of Defendant Nerayoff, Michael Hlady, Mr. Nerayoff's alleged co-conspirator had extensive contacts[4] with the FBI Special Agent Jordan Anderson, the agent who was investigating Mr. Nerayoff, swore out an arrest warrant and was the case agent who assisted AUSA Mark Bini in the prosecution of Mr. Nerayoff. Significantly, Hlady also provided information on Mr. Nerayoff's activities investing in crypto markets with Jonathan Lucas, a subject of a Department of Justice, SEC and FBI investigation that both S/A Anderson and AUSA Bini were involved in, and likely reported on Mr. Nerayoff's activities in the State of Rhode Island involving the crypto industry.[5]

---

[4] As noted in the Declaration, for the period 1/31/2018 through February 2019 Hlady and S/A Anderson texted 100 times, and Hlady used his cell phone to call or receive calls from S/A Anderson's cell phone, his direct line and the main line at the NYI FBI offices on 45 occasions.

[5] See, Declaration at 43:  Hlady messaging with S/A Anderson during Mr. Nerayoff's February 27, 2018 interview at the same time Hlady was messaging Mr. Nerayoff to remind him that he had to leave to drive to Rhode Island to meet with John Harwood an attorney who previously served as Speaker of the Rhode Island House and who was coordinating Mr. Nerayoff's planned overtures to Rhode Island Governor Gina Raimondo and Sen. Sheldon Whitehouse to make Rhode Island the Crypto Capital.

While we submit that that the sheer volume of contacts alone – a total of **100 text messages and 45 calls back and forth between Hlady and Anderson** – supports our belief that Hlady was in fact acting as an informant for S/A Anderson and AUSA Bini (Decl. at ¶¶ 37-46 and nt. 3), the events surrounding the contacts between Hlady, S/A Anderson, and Jane Doe and the pattern of calls between Hlady, S/A Anderson, and Jane Doe all detailed in the Declaration at ¶¶ 79-101 support our belief that the May 18 hotel recording as well as the recordings made by the Seattle Office of the FBI in June and November of  2018, were used by Hlady and Jane Doe to falsely implicate Mr. Nerayoff in criminal conduct that Mr. Nerayoff  had not participated in.

What other logical explanation can there be for Hlady's contact with Jane Doe and S/A Anderson prior to these supposedly secret recordings and other significant events described in the Declaration?  Hlady's empathic admissions of threatening conduct in the May 18, 2018 recording[6], the June 21, 2018 recordings where Hlady and Jane Doe reinforced the "destroy" narrative and the false Ether loan "extortion" lie, including Company 1's demand that Nerayoff pay usurious interest of 180% on the 'loan,'[7] and the November 21, 2018 recording in which Hlady interjected an element of violence by gratuitously reporting that one of his nonexistent teammates had been shot and killed.[8]

---

[6] The May 18, 2018 hotel room recording and the Jane Doe telephone recording on November 21, 2018 appear to be attempts to falsely accuse Mr. Nerayoff hoping that he would not deny each and every allegation against him so that his silence might be deemed an admission. *See*, *Salinas v. Texas*, 570 U.S. 178 (2013). (Prosecution's use of accused's silence proper when, without being in custody or receiving Miranda warnings, asked about crime).  Indeed, according to prior counsel, one of the former prosecutors assigned to this case put great weight on the fact that in the May 18, 2018 recording that Nerayoff only denied the fact that he had threatened Jane Doe and John Doe three times, he was silent when they accused him a fourth time – ironic in that every time Mr. Nerayoff tried to explain himself – and thus present a prior consistent statement of his innocence which might be used to defeat a later claim of recent fabrication under F.R.E. 801(d)(1)(B)(i), Jane Doe repeatedly told him to "stop speaking."

[7] Putting aside the simple fact that the 10,000 Ether Mr. Nerayoff received was not obtained via extortion, this would likely be the first time in the history of American jurisprudence that someone had extorted a loan against property due them that the lender would not release upon a condition that the money extorted be repaid at an annual 180% interest.

[8] This element of violence was not only interjected into the call, it was also recounted in Agent Anderson's complaint which cast Hlady as Mr. Nerayoff's enforcer perhaps because obtaining property via threat of violence is entirely

We also know that although Mr. Nerayoff alerted S/A Anderson and AUSA Bini to the fact that he had been conned by Michael Hlady and had his COO sent a detailed dossier concerning Hlady's fraud to S/A Anderson – a dossier that included the fact that Hlady had through his con insinuated himself into business dealings with the Governor of Rhode Island and its senior United State Senator – neither S/A Anderson nor AUSA Bini would speak to Mr. Nerayoff and Hlady was never charged for the fraud he had perpetrated against Mr. Nerayoff and two senior elected officials, clearly conduct which we believe supports the inference of the government protecting an informant who was their source in a wider Crypto investigation involving Rhode Island's stated desire to be the nation's first Crypto friendly state. [9]

While this information certainly would be sufficient to raise the very strong inference that Hlady was S/A Anderson's informant (*See e.g., United States v. Flores*, 888 F.3d 537, 545 (D.C. Cir. 2018); *Hussain v. Obama, 718 F.3d 964 (D.C. Cir. 2013); Dole v. Williams Enterprises, Inc*, 876 F.2d 186, 188, n.2 (D.C. Cir. 1989) ("WHEREAS it looks like a duck, and WHEREAS it walks like a duck, and WHEREAS it quacks like a duck, WE THEREFORE HOLD that it is a duck").

According to the Department of Justice's own guidelines for the use of confidential informants, a confidential informant is defined as "any individual who provides useful and credible information to a JLEA [Department of Justice Law Enforcement Agency] regarding felonious

---

illegal even if an individual has a claim of right. One of the great ironies of this prosecution is the government's casting Hlady as a violent individual whom Mr. Nerayoff had knowingly hired to extort Company 1 while Mr. Nerayoff had retained "Michael Peters'" services because Mr. Nerayoff had been conned into believing "Peters" was a former decorated government agent, not a killer. Of course, by November 21, 2018, Hlady – who had told Jane Doe in a June 2018 recording that he was leaving Alchemist – had already been exposed as a fraudster as Mr. Nerayoff (and presumably the FBI who was in the room with Jane Doe and recording the call), had already called Jane Doe to alert her to this fact. So, at the time of this "admission" by Hlady, everyone affiliated with the case, including Jane Doe, the FBI and the AUSA, knew that he was a complete fraud.

[9] https://www.golocalprov.com/business/governor-raimondo-pitches-top-blockchain-executives-on-benefits-of-ri

14

criminal activities, and from whom the JLEA expects or intends to obtain additional useful and credible information regarding such activities in the future[10]

Our belief has only been further reinforced by a recent disclosure made by one of the prosecutors assigned to this case. On Friday, February 10, 2023, in a telephone call with Mr. Nerayoff's counsel, he revealed that the government did not have any of the 100 texts or any other information relating to Hlady's contacts with S/A Anderson.  However, when asked to confirm that information in an email, he replied the next day "we're not going to confirm whether any such emails of texts exist given that any request for such information far exceeds the government's Rule 16 obligations."  Notwithstanding this extensive conduct and the FBI's protocols regarding preservation of text messages, that include requiring individual employees to take steps to ensure preservation of such electronic communications relating to a criminal or civil investigation,[11]" the government after first advising orally that there were no texts or emails between Hlady and S/A Anderson in its possession wrote "we're not going to confirm whether any such emails or texts exist given that any request for such information far exceeds the government's Rule 16 obligations."

Is it even plausible that the 100 known text messages that Hlady and S/A Anderson engaged in did not relate to a criminal or civil investigation that S/A Anderson was engaged in?  It is not. Likewise, is it plausible that S/A Anderson didn't make a single record of any of these 100 contacts and 45 phone calls in reports or notes of any kind? [12]  It is not.

---

[10] Department of Justice Guidelines Regarding the Use of Confidential Informants, January 8, 2001 at p. 127. At https://www.aclu.org/other/department-justice-guidelines-regarding-use-of-confidential-informants).

[11] See, Office of the Inspector General U.S. Department of Justice Report of Investigation of Text Messages from Certain FBI Mobile Devices (redacted)  https://oig.justice.gov/reports/2018/i-2018-003523.pdf  at pp. 2,

[12] The apparent failure to preserve these 100 text messages and to document the contact between Hlady and S/A Anderson in those messages and their 45 telephone calls is reminiscent of the 1960s TV Series Mission impossible

Of course, although we believe Hlady is an informant, as he looks and acts like one, (*see* e.g., *Dole v. Williams Enterprises, Inc*, 876 F.2d 186, 188, n.2 (D.C. Cir. 1989) ("WHEREAS it looks like a duck, and WHEREAS it walks like a duck, and WHEREAS it quacks like a duck, WE THEREFORE HOLD that it is a duck"),  we appreciate that what appears to be a duck is sometimes not in fact a duck.  At this point, we are not asking the Court to declare Hlady an informant, we are simply asking the Court to require the government to provide the requested information that will establish if Hlady is in fact an informant.[13]

Like all the information requested in the two letter requests, we believe these texts are crucial to Mr. Nerayoff's defense of this action and indeed this very motion and are thus discoverable under the facts presented, *Brady v. Maryland*, 373 U.S. 83 (1963) and its progeny, Federal Rule of Criminal Procedure 16 and/or this Court's December 10, 2020, Rule 5(f) Order.

Accordingly, Mr. Nerayoff respectfully requests that the Court order the government to provide the items he requested, as indicated below, for the following reasons which we believe are based on objective facts and inferences that naturally flow from them:

1. *Notes and reports of any statements made, or information provided by Michael Hlady to any employee of the Federal Government or its agent (including but not limited to FBI, DOJ, SEC, FINRA)*

As displayed in the accompanying Declaration and argued above, we believe that Michael Hlady who the government cast as Mr. Nerayoff's co-conspirator was actually a government

---

where each episode's introductory scene ended with IMF lead agent Jim Phelps receiving a mission assignment recording that self-destructed after it played: "As always, should you or any of your IM Force be caught or killed, the Secretary will disavow any knowledge of your actions." Only in this case, this is not fiction, it is an actual criminal investigation and prosecution of an innocent man.

[13] If Hlady was in fact S/A Anderson's informant, there could be no conspiracy, as an individual cannot conspire with an informant. *United States v. Hendrickson*, 26 F.3d 321, 333 (2d Cir. 1994). If Hlady was a government agent, his sending the March 28, 2018 text either on his own initiative, or at the direction of the government, would not, even if it was criminal, result in Mr. Nerayoff being criminally liable under any possible legal theory.

informant whose conduct was likely directed by the government. Even assuming *arguendo* that Mr. Nerayoff's dealings with Company 1, John Doe and Jane Doe were of a criminal nature – which clearly they were not – there could be no conspiracy if Hlady was a government informer. *United States v. Hendrickson*, 26 F.3d 321, 333 (2d Cir. 1994).

Further, the text that Hlady sent on March 28, 2018, which Hlady claims was at Mr. Nerayoff's direction, not only was non-sensical as Hlady admittedly knew nothing about Nerayoff's prior dealings with Company 1, Jane Doe and John Doe, it contained language which we believe was crafted to allow the government to get around Nerayoff's claim of right defense as threats of violence are never permissible even when one has a claim of right.  If Hlady was a government agent the only "crime" committed in that text message would have been the creation of a crime to implicate Nerayoff.

2. *Documents provided to any employee of the Federal Government or its agent (including but not limited to FBI, DOJ, SEC, FINRA) by Hlady concerning Steven Nerayoff or Alchemist*

Mr. Nerayoff submits that these documents are also material to the defense of this action and this very motion for the same reasons that support for request 1.

3. *Emails and text messages between Michael Hlady and FBI Agent Jordan Anderson or any other government agent*

Mr. Nerayoff submits that these documents are also material to the defense of this action and this very motion for the same reasons that support request 1.

4. *Recordings made by Michael Hlady of Steven Nerayoff, [Jane Doe] or [John Doe]*

Mr. Nerayoff submits that these documents are also material to the defense of this action and this very motion for the same reasons that support request 1.

5. *Emails and text messages between Michael Hlady and [Jane Doe], [John Doe] or Jeff Pulver*

17

Mr. Nerayoff submits that these documents are also material to the defense of this action and this very motion for the same reasons that support request 1. Further, evidence of Jane Doe's and John Doe's colluding with Hlady both to engage in other criminal activity and to falsely incriminate Mr. Nerayoff would it make it more likely that Hlady was acting not on Mr. Nerayoff's behalf but for Hlady's own benefit, which is relevant to the conspiracy charges.

6.  *To the extent that the FBI has created or maintained any file concerning Hlady and his status as an informant, information source or cooperator, such file would be relevant considering his charged status as a co-conspirator.*

Mr. Nerayoff submits that these documents are also material to the defense of this action and this very motion for the same reasons that support request 1.

7.  *We also request an opportunity to examine any cell phone or personal computer, laptop, tablet or any other device in the possession of the government to search for the items sought in paragraphs 1-7.*

The government has informed us that they intend to search a device belonging to Mr. Hlady to determine if any material on that device should be provided to Mr. Nerayoff.  Although we surely would have preferred that the government conduct that search shortly after we raised the issue of Hlady's extensive contacts with S/A Anderson in June, we commend the government for their efforts in this regard and as such we will await the government's response before asking the Court to take any action.

8.  *Any reports or notes by members of the Federal Government regarding the arrest of Steven Nerayoff on September 19, 2019 and a copy of the warrant to search Mr. Nerayoff's home on that date*

Given Mr. Nerayoff's detailed allegations regarding S/A Anderson's conduct on the day of his arrest, allegations which support the inference that this prosecution was motivated not by the evidence that the government had but rather as a means of gaining entrée into the crypto world. Indeed, it is somewhat puzzling that the government has taken the position that Mr. Nerayoff is

not entitled to any report generated as a result of his arrest as the government provided Mr.

Nerayoff with a 302 report relating to Hlady's arrest in discovery (DOJ-000006049).

9. *A copy of the subpoena that Mr. Nerayoff received on February 27, 2018 pertaining to a purported investigation of Jonathan Lucas*

As noted in the Declaration in support of this motion, Mr. Nerayoff received a Grand Jury

subpoena from AUSA Bini in the Eastern District of New York.  That subpoena sought information

regarding Mr. Nerayoff's dealings with Jonathan Lucas who was under investigation for alleged

criminal securities violations by AUSA Bini.  Lucas at one point sent Nerayoff as voice message

which appears to have been an invitation to obstruct justice in connection to the EDNY inquiry

(Nerayoff did not reply to the message).  We believe that the Grand Jury subpoena issued by AUSA

Bini was part of the government's effort to use both Lucas and Hlady in their attempts to fabricate

a case against Mr. Nerayoff.[14]   The government's refusal to provide a copy of this subpoena is

curious as there is no dispute that Nerayoff received the subpoena from AUSA Bini.

10. *A copy of any notes and reports relating to Mark Bartlett, Esq contact with the NYC FBI office in September of 2018 relating to [Company 1], Nerayoff, Hlady, [Jane Doe] or [John Doe].*

As noted in the Declaration in support of this motion, Company 1 hired a criminal defense

attorney in May of 2018 who then proceeded to bill Company 1 for matters related to Company 1

and Nerayoff's company Alchemist (¶ 66 and nt. 85).  On September 30, 2018, that attorney billed

Company 1 for a Meeting with the NYC FBI. That meeting, was held just days after a pregnant

Jane Doe was just fired by Company 1, had telephoned S/A Anderson on the day she was fired.

---

[14] In addition to the odd, apparent, invitation to obstruct justice voice message that Lucas left Nerayoff we also know that Lucas, who had been under criminal investigation, was allowed to enter a civil settlement with the SEC in connection with a civil complaint that was filed and settled on the same day, perhaps not coincidentally the day after Mr. Nerayoff was arrested in September of 2019, not in the Eastern District of New York where he was being investigated, but in the Southern District of New York (Decl. at ¶147 ).

Afterwards, Jane Doe hired her own criminal defense attorney.  As also noted in the Declaration, it appears that Jane Doe and Michael Hlady continued to have a distinct relationship separate and apart from their relationships with Mr. Nerayoff.  While we do not know for sure if Jane Doe was fired for conspiring in some way with Hlady – as John Doe refused to speak to counsel for Mr. Nerayoff – we do know, from government provided discovery, that Hlady travelled to Seattle on several occasions, more occasions in fact than we have reports from the government of recorded calls.  We believe that any notes and reports regarding Company 1's transmission of information to the FBI regarding Jane Doe's conduct with Hlady would strongly support our belief, that Hlady and Jane Doe were acting together to create a false narrative against Mr. Nerayoff and thus are necessary to not only the defense of this action but to the instant motion.  Again, if Hlady and Jane Doe were in fact colluding, to engage in other criminal activity and to falsely incriminate Mr. Nerayoff, evidence of this would make it more likely that Hlady was acting not on Mr. Nerayoff's behalf but for Hlady's own benefit, which is relevant to the conspiracy charges.

11. *To inspect and to copy, photograph, etc. any of Mr. Nerayoff's papers, documents, data, photographs, tangible objects, in the government's possession, custody, or control obtained from Mr. Nerayoff or previously under his control—including but not limited to the digital information the Government received from Apple Inc. that resided on Mr. Nerayoff's Apple i-cloud backup.  We would also request an inventory of these items.*

While the government did not respond specifically to this request in its February 11, 2023 email, during my February 10, 2023 telephone call with AUSA Enright I asked if the government had anything of Mr. Nerayoff in its possession that was subject to this demand and in particular if the government obtained the three Skype Business Meeting videos pursuant to the FBI's March 2, 2019 subpoena to Apple Inc.  AUSA Enright did not directly respond to the question but noted that the government can only obtain content from search warrants and not subpoenas.  We do not believe that the issuance of a subpoena, rather than a search warrant, would necessarily restrict the

government's ability to obtain non-content as according to the Justice Department's Computer Crime manual, agents can obtain opened and sent email (and other stored electronic or wire communications in "electronic storage" more than 180 days) and retrieved communications and the content of other stored files using a mere subpoena, provided they comply with applicable Stored Communication Act notice provisions—which includes delaying prior notification to the customer or subscriber for ninety day periods based upon a supervisory official's written certification that the existence of the subpoena may have an adverse effect[15]—which is what the FBI apparently did when they served Apple with a subpoena and Apple delayed notifying Mr. Nerayoff until months later.

As noted in the Declaration, the government seized Mr. Nerayoff's iPhone on the day of his arrest and attempted to get him to unlock it so to examine its contents, which would have given them access to his iCloud backup directly from the iPhone. While we do not know if they were successful in their attempts to obtain anything from the subpoena sent to Apple or the iPhone that the FBI seized from Mr. Nerayoff, we do know that Rule 16 provides that the government must allow us an opportunity to inspect and to copy any document, video, or item of any sort of Mr. Nerayoff's that is in the government's possession pursuant to Fed. Rule Crim. Pro. 16(E)(i) and (iii).

We submit that each of the requested items that we seek the Court's intervention are narrowly tailored and material to the Motion to Dismiss, Defendant Nerayoff's defense, both on the issue of his actual innocence in his dealings with Company 1, and as to Hlady's activities with

---

[15] *Searching and Seizing Computers and Obtaining Electronic Evidence in Criminal Investigations*--Computer Crime and Intellectual Property Section Criminal Division:  https://www.justice.gov/file/442111/download at pp. 129-130, 138

both the government and Jane Doe and request that the Court order the government to produce responsive material without undue delay.

## CONCLUSION

For the foregoing reasons, Mr. Nerayoff respectfully requests that the indictment be dismissed against him with prejudice, or in the alternative that the Court order relevant portions of the Grand Jury proceeding released to Mr. Nerayoff and compel the Government to provide information responsive to Mr. Nerayoff's two outstanding demands and to renew and supplement the motion to dismiss with this information.

Dated: February 13, 2023

Respectfully Submitted,

/s/ Michael A. Scotto
Michael A. Scotto
1225 Franklin Ave, Suite 325
Garden City, NY 11530
(516) 506-2302
mascottoesq@gmail.com

Attorney for Defendant, Steven Nerayoff