UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------x

UNITED STATES OF AMERICA,                    Case No. 1:20-cr-00008 (MKB)

        -against-                    **DECLARATION OF**
                                              **MICHAEL A. SCOTTO, ESQ**.

STEVEN NERAYOFF,
--------------------------------------------------x

      MICHAEL A. SCOTTO, ESQ., hereby declares, pursuant to 28 U.S.C. § 1746 and under the penalty of perjury as follows:

      1.      I am the attorney for defendant Steven Nerayoff ("Mr. Nerayoff") in the above-captioned case. I submit this declaration in reply to the government's Opposition (ECF 112) to Mr. Nerayoff's Motion to Dismiss the Indictment (ECF 105) and in further support of that motion and joining with the government's motion to dismiss the indictment with prejudice—but not because they cannot prove Mr. Nerayoff's guilt beyond a reasonable doubt, but because Mr. Nerayoff is factually innocent.

      2.      The reason we submit this declaration is to set the record straight, as the government's opposition, which are bereft of any sworn allegations in support thereof, does not address the core issue before the Court—that the alleged victims lied regarding their dealings with Mr. Nerayoff and the government knowingly advanced perjured testimony—but rather moves to dismiss because they cannot prove his guilt beyond a reasonable doubt. [1]

---

[1] As the other issues raised in Mr. Nerayoff's motion are not critical to the resolution of this case given the government's filing, and will no doubt be the subject of another future proceeding brought by Mr. Nerayoff, this reply only focuses on the issue of Mr. Nerayoff's innocence and the fact that the government arrested, indicted and prosecuted him knowing he was innocent.

3.      Since filing our motion to dismiss we've located additional documents, described below and included as exhibits with this submission, which together with our prior submission, clearly establishes that **the government was aware that Mr. Nerayoff was innocent of each of the charges contained in the indictment and that the government knowingly advanced perjured testimony to the grand jury.** Specifically, that:

a.      Mr. Nerayoff did not force the alleged victims into voiding the July 22, 2017 contract (Count 1 and 2).

b.      Mr. Nerayoff did not receive  30,000 Ether from Company 1 he was not entitled to receive (Count 1 and 2).

c.      The terms of the November 6, 2017 Service Payment Agreement between Company 1 and Mr. Nerayoff were the result of a freely negotiated new contract, he did not force Company 1 to provide him with more generous terms (Count 1 and 2).

d.      Mr. Nerayoff's receipt of 10,000 Ether in March of 2018 was a result of Company 1's offer to provide a fraction of the value due to Mr. Nerayoff for tokens that they refused to release, it was not obtained by way of extortion  (Count 3 and Count 4), and the government relied on a fabricated loan document that the alleged extortioner Hlady directed his alleged victim Jane Doe to create.

e.      The government was aware when they initiated this prosecution that Mr. Nerayoff had a claim of right for hundreds of million dollars of Company 1 tokens; and

f.      The government knew Jane Doe's and John Doe's accounts of their dealings with Mr. Nerayoff on behalf of Company 1 were false prior to the government's obtaining an arrest warrant and indictment against Mr. Nerayoff and that they knowingly advanced the perjured testimony upon which the indictment rests.

4.      The government provided Mr. Nerayoff with a total of 103,374 pages of discovery in this matter (see ECF document 87). 41,891 pages of that material came from Company 1. Contained within those 41,891 pages of Company 1 documents are four additional documents (and accompanying items) which were not included in the February 13 motion as they were only discovered after the motion was filed.[2]   The delayed inclusion of this material was not intended to sandbag the government, as the material was all produced by the government in discovery, only came to light after my motion papers were submitted and I emailed one of the prosecutors assigned to the case to alert him that I had located three of the documents.[3]

5.      For the reasons explained below, each of these four documents directly supports Mr. Nerayoff's claim that the indictment returned against him was based on false and perjurious testimony and that the government knew as early as June 20, 2018[4] that there was no extortion scheme, Mr. Nerayoff had an absolute right to obtain property from Company 1 and that he was indeed innocent of the allegations contained in the indictment it later obtained:

(1) a September 10, 2017 email that Jane Doe drafted, the subject "[Jane Doe] WILL DELETE THIS AFTER THE CALL FYI," which appear to be her notes for the September 10, 2017 Skype Meeting with Mr. Nerayoff described in our February 13 motion (Exhibit 58: Company 1_018071).

(2)      emails between John Doe and other executives at Company 1 which revealed that Jane Doe had been fired by Company 1 for her attempt to "forcibly sell the company" to Mr. Nerayoff's company (Exhibit 59 Company 1_37496).

---

[2]  Although I am the fourth attorney to have appeared in this action on behalf of Mr. Nerayoff after the government provided these records on June 29, 2020 (my February 13 declaration incorrectly stated June 20, 2020), I appear to be the first to have examined each of these 41,891 pages.

[3] In that same email I also requested a copy of timeline referenced in one of the documents that related to Jane Doe's employment at Company 1 being terminated for her attempt to "forcibly sell" Company 1 to Mr. Nerayoff.  As of the date of this declaration the government has not responded to my request and the government's opposition papers don't address the issue.

[4] Although in our February 13, 2023 motion we argued that government knew or should have known of Mr. Nerayoff's actual innocent and that the alleged victims had falsely accused him, as explained below these documents move the government's knowledge firmly into the government knew column.

(3) a November 9, 2018 Securities and Exchange Commission subpoena to Jane Doe for records relating to Company 1's ICO and threats made by Mr. Nerayoff and Hlady issued by SEC Enforcement Attorney Jon Daniels under the case name Fantasy Markets  (Exhibit 60: Company 1_ 013902).

(4) a June 20, 2018 email Jane Doe sent FBI Special Agent Andrew Cropcho ("S/A Cropcho"), which contained several documents relating to alleged threats by Mr. Nerayoff and Michael Peters and S/A Cropcho's reply acknowledging receipt (Exhibit 61: Company 1_011303).[5]

**Jane Doe's September 10, 2017 email to herself with negotiation notes**

6.      As noted in my February 13, 2023 declaration, on September 10, 2017 John Doe wrote Mr. Nerayoff thanking Mr. Nerayoff "for everything you have done for us" (Exhibit 11: Company 1_014702). In that same email John Doe told Mr. Nerayoff "[w]ith the enormous value you've helped us bring  to the project, we think your proposal is fair in terms of ETH (30,000 ETH+ the additional 6,00 ETH bonus for crowdsale success to 100%)."

7.      That same day, September 10, 2017,  Jane Doe drafted herself an email, the subject "[Jane Doe] WILL DELETE THIS AFTER THE CALL FYI," (Exhibit 61: Company 1_018071), which appear to be her notes for the September 10, 2017 Skype Meeting with Mr. Nerayoff described in our February 13 motion.

8.      Ms. Doe's notes confirm that the parties had to rework the July 27, 2017 agreement because their mutual misunderstanding had resulted in  "numbers [being] very, very, very, very, very off."  Her notes also included "Alchemist got us a crazy advisor board," and "[w]hatever number they come back with, go back to David and ask to help negotiate a better deal. David can talk to Steven…"

---

[5] Copies of Ms. Doe's June 20, 2018 email to S/A Cropcho appear thrice in the government's discovery (at Company 1_011303, Company 1_024353 and Company 1_024891).  The attachments to her email only appear once, in the documents that follow Company 1_024891.

9.      We submit that these notes are hardly the notes of an extortion victim. Rather these notes are consistent with the entirely lawful, mutually beneficial, renewed negotiations conducted during the November 6, 2017 Skype Business meeting (Exhibit 17 recording and 18 transcript) and Jane Doe's email and two pages of screen shots that she sent Mr Nerayoff at the conclusion of that Skype Meeting (Exhibit 20, Company 1_014709-10, a document that the government had in its possession as early as February 5, 2019).

10.     Even if the government didn't possess Mr. Nerayoff's Skype Business Meeting recordings, they did possess these two September 10, 2017 emails and Ms. Doe's November 6, 2017 email  which establish that the July 2017 agreement was not reworked as a result of extortion and that Mr. Nerayoff was entitled to the 30,000 Ether the government claimed he extorted.  It is absolutely clear that these three documents were in the possession of the government no later than February 5, 2019 when Company 1 provided those two emails to the government,[6] yet they arrested, indicted and prosecuted Mr. Nerayoff.

**Jane Doe's contact with Special Agent Andrew Cropcho of the Seattle FBI**

11.     My February 13, 2023 declaration described contact between Jane Doe and Michael Hlady that occurred in June of 2018 (Decl. at ¶¶ 79-84), including a June 21, 2018 call between Jane Doe and Hlady which was recorded by agents from the Seattle Office of the FBI. During that call Jane Doe noted that Hlady's demeanor during the call was different than when he had visited her in Seattle two weeks before the call (Decl. at ¶83).

12.     S/A Cropcho's cell phone and direct line at the Seattle Office of the FBI were included in the email signature block of his reply to Jane Doe's February 20, 2018 email in which

---

[6] As noted below, we believe the government was in possession of numerous Company 1 documents which established Mr. Nerayoff's actual innocence as early as November 16, 2018 when Company 1 responded to a subpoena that Jane Doe received from the New York Enforcement Office of the SEC.

he thanked her for sending the information (Exhibit 58).  Based on an analysis of Jane Doe's telephone records she spoke at length with S/A Cropcho on June 19, 2018,[7] the day prior to her sending the June 20, 2018 email (Exhibit 58) and two days before the call with Hlady during which she noticed his changed demeanor.

13.    Ms. Doe's June 20, 2018 email to S/A Cropcho (Exhibit 58) included several attachments and her description of each item.[8]  Ms. Doe wrote:

Hi, Andrew.

Please find attached (what was "send-able" via email).

- Signed _Company 1_Proposal w Maple Ventures (July 27, 2017)-Original Agreement
- SAFE_JeffPulver and SAFE_StevenNerayoff (October 1, 2017)-$25,000 each investment into the company
- ADVISOR_JeffPulver and ADVISOR_StevenNerayoff—documents giving them additional stock options because they decided they deserved to be in the previous investment round (they didn't, but they were being somewhat helpdful).
- SpecialSteve_Agreement (November 6, 2017)-signed documents that we were forced to sign the night before our tokensale
- "Please sign ASAP".eml-the documents we signed on November 6th, 2017
- May threats.mp4 (recording conversation with Steve (main speaker), Jeff (guy in the background that is denying everything), + Mike/Mike's friend/Alex in the room with [Jane Doe] and [John Doe]
- Airdrop reconnaissance-request by Michael to understand the "disagreement." This request was made the SAME day in NYC as the May Threats.mp4 recording.
- 10,000 ETH LOAN+ - request by Michael was for me to send an email to him asking for the payment plan. He never sent one.
- Fwd-ETH?.eml—I asked [Company 1 executive] to send this. In our attempts to try and manage the Steven situation, we used [Company 1 executive] as the grumpy bad guy in the background to get Steven to do things.  It worked before.  Not this time (10,000 ETH).

---

[7]  On June 19, 2018 at 3:51 p.m. (Pacific) Jane Doe's cell phone received a thirty-six minute call from S/A Cropcho's cell phone.  At  5:43 p.m. S/A Cropcho's cell phone called her again and the two spoke for an additional twenty-seven minutes.

[8] Jane Doe emailed S/A Cropcho at 6:59 p.m. on June 20, 2018.  Earlier that same day, Jane Doe's cell phone had the following pertinent calling activity:  an 8:45 a.m. call to Michael "Peters"/Hlady's cell phone lasting four seconds , a 1:48 p.m. call to S/A Cropcho's cell phone which resulted in a two minute call, a 2:50 p.m. call to Hlady's cell phone and a call back at 2:51 p.m. lasting five seconds, a 4:35 p.m. call from the Seattle FBI Office which lasted eight seconds, followed by a three second call from S/A Cropcho's cell phone, and a 5:08 p.m. call from S/A Cropcho's cell phone which lasted  sixteen  minutes.

- Confirming our agreement.eml—was written by Steven recapping what he thought was the deal after he received the the 10,000 ETH. We didn't have a choice. (Screenshots of text threats attached, this was in addition to hours and hours of in person threats and/or phone calls with yelling).

14.     Jane Doe's June 20, 2018 email and the attached documents and audio recording, which S/A Cropcho thanked her for sending, clearly establishes that the FBI knew as of that date that Mr. Nerayoff did not commit a crime and that the allegations were based on fabricated evidence—evidence which the government used to create recordings which falsely incriminated Mr. Nerayoff.  I base my conclusion on the following facts.

15.     Jane Doe provided screenshots of texts with Mr. Nerayoff on March 28, 2018 relating to the Ether "loan" that is the basis for Counts 3 and 4 of the indictment. Although Ms. Doe copied the texts to the body of the email in reverse order[9], anyone reading the texts could plainly see that her exchange with  Mr. Nerayoff's was about confirming the deal that the parties had reached earlier and that the extortion narrative that Ms. Doe presented to S/A Cropcho was a work of fiction.

    Mr. Nerayoff wrote:

> My only issue is the total amount of collateral should be what I could have sold it for last week. So I'll come up with a different collateral amount. None of it should matter since I wouldn't sell into those before a merger. But it was between .06-.07.  It's just a matter of fairness. In the end I want the tokens, not the ether but it needs to be fair.  It's about 70 million should be as collateral.  It's a right thing but practically it won't matter.  You understand how I operate it's about what's right and what was promised. So 350 million is way less than I would have received but I'm willing to find a medium.  I would have sold last week so that  average I am saying is about 6.5 cents is what will be kept as collateral. My intent  is to get all the tokens but we have to write it up properly up front and given the merger none of this will matter anyway.

    Ms. Doe replied:

---

[9] The actual order that the messages were received and should have appeared was Company 1_011307, Company 1_011306, and Company 1_011305.

> Had to read a few times. I think I understand.
> Clarify Please.
> We send 10,000 ETH as "loan". We have 70,000,000 tokens as collateral.
> Correct?
> Confirm?

16.     Similarly, the attached audio recording of the May 18, 2018 hotel room meeting,[10] that Ms. Doe labelled MayThreats.mp4, actually included Mr. Nerayoff repeatedly denying that he had threatened anyone, asking both Jane Doe and John Doe if they ever lived up to their agreements, being shouted down by Ms. Doe when he attempted to continue to rebut their false accusations and noting that Company1 could sell the 70,000,000 Company 1 tokens that he had pledged as collateral for the loan.[11]

17.     The alleged requirement that the loan be repaid by a certain date and with interest was never mentioned during the May 18, 2018 recorded meeting by either John Doe or Jane Doe.[12] After John Doe declined Mr. Nerayoff's offer to sell the tokens he had pledged as collateral, thus satisfying the "loan," John Doe merely asked "So, so you are saying the Ether will not be given back to us?"

---

[10] Exhibit 38 (recording) and Exhibit 39 (transcript) in support of this motion.

[11] The email is also significant as it confirms that Mr. Nerayoff and Jeff Pulver both invested $25,000 in Company 1, and both were given stock options in Company 1. This email is also the first known recorded instance of Jane Doe lying to a Federal Agent in the investigation that we are aware of.  Not only did she lie about the nature of the parties relationship (claiming that they were forced to sign the November 6, 2017 agreement with Mr. Nerayoff the night before the token sale), she also lied regarding Company 1 voluntarily agreeing to allow Mr. Nerayoff to participate in the loyalty token program (see, February 13, 2023 declaration at  ¶ 63),and falsely claimed that the Ether 'loan' was only provided to Mr. Nerayoff as a result of threats, rather than an business negotiation which saw Company 1 provide Mr. Nerayoff with a mere 4% of the value he was entitled to, at the cost of Mr. Nerayoff forfeiting half of the loyalty tokens he was entitled to--which resulted in Company 1 actually netting ten million dollars from the deal!

[12] Mr. Nerayoff was unaware that the meeting was being recorded.  During the meeting Mr. Nerayoff denied threatening Jane Doe or John Doe, accused them of failing to live up to any of the parties' lawfully entered agreements ("So, you're saying that the agreement, as that we had is not valid? I'm just, I wanna know, I'm just, I want to know at what point is an agreement valid with you two?" February 13, 2023 Declaration at ¶ 77) and directed them to sell the 70 million Company 1 tokens he had pledged as collateral.

18.     The attached May 16, 2018, email "10,000 ETH LOAN +30 interest[13]" was described by Ms. Doe as stemming from  a "request by Michael was for me to send an email to him asking for the payment plan. He never sent one."

19.     Remarkably, Ms. Doe's email to S/A Cropcho explained that her extortioner asked her to state the terms of a "loan" repayment (a "loan" in name only, that was quite clearly one without interest), and in turn Ms. Doe drafted an email that falsely claimed that Mr. Nerayoff was required to repay the "10,000 ETH + 30% interest—ideally before June 1 2018 as discussed. Please let us know the plan for repayment for the 13,000 ETH.[14]"

20.     Of course, in truth there was no such deal.  Indeed, Ms. Doe's texts with Mr. Nerayoff on March 28, 2018 confirmed that the "loan" of 10,000 ETH to Mr. Nerayoff did not require repayment at any particular time, nor did it require repayment with interest.[15]  Ms. Doe's May 16, 2018 email to Michael "Peters" was a work of fiction, which S/A Cropcho must have known because he read it and thanked Jane Doe for sending it.   No extortioner asks their alleged victim to provide repayment terms for monies allegedly extorted by them, and a repayment with interest.

21.     The attached May 3, 2018 email from a Company 1 executive that Ms. Doe had forwarded to Mr. Nerayoff (Exhibit 63, Company 1_024958), that Ms. Doe described as "in our attempts to try and manage the Steven situation, we used [Company 1 executive] as the grumpy bad guy in the background to get Steven to do things," also establishes that the requirement to

---

[13] Exhibit 62: Company 1_024957.

[14] **Ibid.**

[15] Why after forfeiting millions of dollars' worth of loyalty program tokens would Mr. Nerayoff agree to pay interest that actually amounted to 180% per annum for a "loan" that Company 1 offered him after refusing to release any of his then due billion plus tokens?  The simple answer is, he did not.

repay the loan was entirely made up and that the Ether was not provided to Mr. Nerayoff as a result of any threat.   Company 1 Executive wrote "In case you guys are not watching, we need this ETH sooner rather than later. I'm thinking June 1, 2018. Please tell Steve. No more, ever again."

22.    Although Company 1 Executive was not involved in the negotiations between Mr. Nerayoff and Jane Doe or John Doe regarding the 10,000 Ether "loan," Company 1 Executive proposed June 1 as the day that he believed the Ether with interest should be returned by and Jane Doe in turn wrote to Hlady two days before the May 18, 2018 recording that the Ether needed to be repaid with interest ideally before June 1, 2018.

23.    Finally, the email labelled "Confirming our agreement.eml," (Exhibit 64: Company 1_024959, that Ms. Doe wrote "was written by Steven recapping what he thought was the deal after he received the 10,000 ETH. We didn't have a choice," was also facially false.   The terms of the Ether "loan" that the parties agreed to via text did not provide a date for repayment nor the payment of interest, they merely required Mr. Nerayoff to pledge 70 million of his Company 1 tokens held by Company 1 as collateral.  Collateral of course is forfeited when a loan isn't repaid. Mr. Nerayoff's March 30, 2018 truthfully and accurately confirmed the terms of the "loan" when he wrote "I can choose to repay the loan of the 10k ether or simply forfeit 70 million tokens in satisfaction of the loan instead at any point"

24.    The government knew that Mr. Nerayoff elected to keep the Ether and directed John Doe to sell the 70 million tokens, as Jane Doe had provided S/A Cropcho with the recording of the May 18, 2018 hotel room meeting.  The government also knew that John Doe refused to sell the tokens and allow Mr. Nerayoff to satisfy the terms of the "loan."  Although John Doe did not provide a reason for being unable to sell the tokens Mr. Nerayoff pledged as collateral,  Jane Doe and John Doe arranged the meeting for the express purpose of staging a recording that would cast

Mr. Nerayoff as an extortionist, it seems evident that Mr. Nerayoff's satisfying the loan would not have served their purpose.

25.     Based on Jane Does June 20, 2018 email to S/A Cropcho the government knew two things.  First that there was no extortion and second that Hlady wasn't working with Mr. Nerayoff, he was working against him.  Since the terms of the loan were clear—Mr. Nerayoff could either repay the loan or forfeit the tokens, we believe that the only inference to draw from the email is that Hlady--who had been in extensive conduct with S/A Anderson, contact that the government refuses to provide information on—was changing the nature of the transaction as part of his work with S/A Anderson and in coordination with Jane. Doe.[16]

26.     Jane Doe's email to S/A Cropcho is also significant for what it did not include, namely text messages she had with Hlady after she received the text from Hlady on March 28, 2018 and had already agreed to sending Mr. Nerayoff the 10,000 Ether.  Those messages which were provided by the government in discovery on February 25, 2020 (DOJ-00005942-43), clearly rebut Ms. Doe's extortion narrative:

> "I just got off call w Steve.  I have [John Doe] on the same page.  It took a lot of extra time cuz of the pressure yesterday.   We are both in sync. [John Doe] just needs time and coaching.
> He really means well. I know you and Steve mean well too.

Hlady replied:
>  thanks—and I do appreciate that [Jane Doe]—I honestly do want you (and [John Doe]) to be successful. And I know it CAN be.

To which Ms. Doe replied:

> I know. We will make this work—and I know with your/Steve/Jeff's Help, it'll be better together. Plus I have already learned an immense amount from you.

[16] What other explanation can there be?  Did Hlady suggest Mr. Nerayoff pay 180% interest so that he could receive a portion of the additional Ether from Company 1? Mr. Nerayoff was never required to repay the loan, let alone repay it with 180% interest so Hlady would have received nothing.

27.     Although Ms. Doe did not include these screenshots in her email to S/A Cropcho, given that they were provided to Mr. Nerayoff within a month of his indictment I believe that the government obtained them from Ms. Doe prior to presenting the case to the grand jury that returned the indictment against Mr. Nerayoff and likely even before S/A Anderson obtained the September 17, 2019 warrant for Mr. Nerayoff's arrest.

28.     Of course, notwithstanding that the story that Ms. Doe presented to S/A Cropcho was false on its face, S/A Cropcho participated in numerous attempts to record Ms. Doe's conversations with Hlady, conversations which as described in my February 13, 2023 declaration, were staged to memorialize false inculpatory statements regarding Mr. Nerayoff.  No doubt, the government introduced these false recordings in the grand jury to support the alleged conspiracy and would have attempted to introduce those recordings at a trial of Mr. Nerayoff--although there was no conspiracy.[17]

29.     I also believe that Ms. Doe's email with S/A Cropcho and her extensive telephone contact with S/A Cropcho suggests a reason for Hlady's apparent change of demeanor in the June 21, 2018 recorded phone call with Ms. Doe—that Hlady may have been tipped off by someone in the FBI that the Seattle Office had opened a case into Hlady's interaction with Jane Doe and Company 1.[18]

---

[17] While Hlady himself noted in one June of 2018 recorded call that he was no longer working with Mr. Nerayoff, and it was abundantly clear that Hlady was never working for Mr. Nerayoff—rather he was stealing money from him as part of his elaborate con and reporting on Mr. Nerayoff's activities to the government.

[18] It is also possible that Ms. Doe, who was in contact with Hlady prior to the calls tipped Hlady off, although given that she had reported Hlady's threats to S/A Cropcho and she was the one who noted his demeanor had changed it is unclear why she would do so.  What is clear is that for some reason Hlady went from allegedly strong-arming Ms. Doe to only being concerned with her happiness.

30.     I base this belief upon Hlady's unexplained extensive contacts[19] with S/A Anderson of the New York Office during the course of the investigation (100 text messages and 45 calls which the government refuses to provide information on, or confirm in writing if they exist or not), and the Department of Justice's deconfliction database which is designed "to determine roles and responsibilities and to coordinate investigations to ensure that agents are not pursuing the same targets..." so that "[i]f an agent discovers that another component is investigating the same target, the database is to provide the agent with the information needed to make a contact with the other component to discuss the case."[20]

31.     It is clear from S/A Cropcho's extensive communication with Jane Doe on June 19 and June 20, and her June 20, 2018 email to S/A Cropcho that Hlady was the subject of a federal extortion investigation days before Hlady was recorded speaking to Jane Doe on June 21, 2018. Given the change in Hlady's demeanor, from allegedly strong-arming Jane Doe, John Doe and Company 1 to only wanting them to be happy, the agents in the Seattle Field Office, following protocol, must have entered Michael "Peters" name into the DOJ system and upon learning that "Peters" was connected to S/A Anderson's New York investigation contacted S/A Anderson, who in turn tipped Hlady off to Seattle's investigation.[21]  This desire to protect an informant would also explain why the case was not brought in the Western District of Washington, but rather in the

---

[19] Although ft nt. 3 of my February 13, 2023 declaration correctly provided the period during which the 100 texts and 45 phone calls between Hlady and S/A Anderson occurred, (from January 31, 2018 through February 18, 2019), Paragraph 6 of that same declaration incorrectly stated that the contact ended in the end of November of 2018.

[20] See *Government Accounting Office report number GAO-11-314 entitled "Law Enforcement Coordination: DOJ Could Improve Its Process for Identifying Disagreements among Agents."*  https://www.gao.gov/assets/a317577.html

[21] Indeed, even Ms. Doe's attorney, Harold Malkin, an experienced former Assistant United States attorney for the Western District of Washington State told Ms. Doe in the November 21, 2018 recording (the inadvertent in room recording captured by FBI Agents from the Seattle Office), "he's probably got FBI agents with him at the moment recording you at the moment" (February 13, 2023 declaration at ¶101).  While this comment of course raises the question, what criminal activity would Jane Doe have been involved in with Hlady that would lead to Hlady's calls with Jane Doe being recorded by other FBI Agents, if Hlady was recording those calls it would obviously be under the supervision of S/A Anderson given his extensive unexplained contact with S/A Anderson.

Eastern District of New York—notwithstanding the fact that the alleged "victim" was a Seattle based company[22] who had hired a former First Assistant United States Attorney for the Western District of Seattle to represent them.

**Jane Doe fired by Company 1 for "attempt to forcibly sell the company to Alchemist (Steven)"**

     32.    On the morning of September 24, 2018, John Doe fired Jane Doe, who was then a few months pregnant, from Company 1.[23]  Based on a review of Company 1 emails we know that Company 1 began a sort of internal investigation sometime after she was fired.[24]

---

[22] See, https://www.justice.gov/usao-edny/pr/two-arrested-extortion-startup-cryptocurrency-company

[23] That same day Jane Doe received a 42 second call from the NY FBI Office main line.

The next day, September 25, 2018, Ms. Doe placed a series of texts to S/A Cropcho's cell phone: at 7:08 a.m (2), 7:36 a.m., 11:22 a.m., (2), 11:23 a.m. (2) and received texts back from S/A Cropcho's cell at 11:30 a.m., 11:32 a.m., 11:33a.m., and 11:35 a.m.  At 11:43 a.m., Jane Doe called S/A Anderson's direct line at the NY Office of the FBI. The call lasted 39 seconds. Jane Doe's cell received texts from S/A Cropcho's cell at 1:16 p.m, 1:18 p.m. and 1:22 p.m.  At 3:09 p.m. Jane Doe called S/A Anderson's direct line at FBI. The call lasted 41 seconds. At 4:39 p.m. Jane Doe's cell texted S/A Cropcho's cell.

On September 26, 2018, at 7:48 a.m. The NY FBI called Jane Doe. The call lasted 43 min and 24 seconds. At 8:34 a.m., the NY FBI called Jane Doe. The call lasted 9 min and 56 seconds.

On September 27, 2018, at 1:07 pm The NY FBI called Jane Doe. The call lasted 41 seconds.  Later that same day at 4:32 p.m., Jane Doe called Seattle criminal defense attorney Harold Malkin on his cell phone, the call lasted 16 minutes and 33 second.

Also, on September 27, 2018, the NY FBI subpoenaed telephone billing records for both Hlady and Jane Doe 1's cell phones for the period January 1, 2016 through that date.  We do not believe that the FBI subpoenaed both Jane Doe's the alleged victim and Hlady the alleged extortioner's telephones on the exact same day, for the exact same period of time, by coincidence.  It is curious that S/A Anderson subpoenaed Hlady's phone records for the same period of time as Jane Does, as Hlady was incarcerated from January 14, 2016 through October 31, 2017.  Cell phones are considered contraband in the Massachusetts (and all American) prison systems, so it is unlikely that S/A Anderson requested the records for this period in an attempt to obtain actual call records. Did S/A Anderson request records for this period so as to not reveal that he knew Michael Peters was actually Michael Hlady, which one might do if an individual was one's informant?  Given the fact that the government has refused to provide us any information regarding Hlady's 100 texts and 45 phone contacts with S/A Anderson we can only speculate.

[24] On September 30, 2018, less than a week after Jane Doe was fired, Company 1's attorney Mark Bartlett's firm billed Company 1 for "New York FBI Meeting."  Mr. Bartlett served as an Assistant United States Attorney for the Western District of Washington State for over twenty-five years, his last nine as First Assistant.  Although Mr. Nerayoff's July 18, 2022 request to the government sought records relating to Mr. Bartlett's contact with the FBI, records which we believe would be highly relevant and material to Mr. Nerayoff's defense and indeed this motion, the government has not specifically responded to the request. These records would explain why Jane Doe's termination for trying to "forcibly sell the company to Alchemist (Steven)" was the subject of a New York FBI meeting and not a Seattle FBI meeting and resulting prosecution.

33.     On November 5, 2018 John Doe emailed several of his senior staff  directing them to assemble information regarding Jane Doe's firing.  John Doe noted a few things that they were then aware of, which included Jane Doe "Reading a book on taking over a company" (See email thread contained in Exhibit 59). Ultimately, by November 14, 2018, Company 1 had created "a timeline[25] on [Jane Doe's] attempt to forcibly sell the company to Alchemist (Steven)" (Ibid).

34.     The complaint filed by S/A Anderson in support of the warrant for Mr. Nerayoff's arrest included a claim that Mr. Nerayoff wanted to acquire Company 1, presumably by threats as it was included in the facts supporting the Hobbs Act Conspiracy charge (Exhibit 4: Complaint at ¶29).

35.     From the recordings provided by the government in discovery, we know that the last time that Mr. Nerayoff had spoken with Jane Doe prior to the November 21, 2018 recorded call was during the May 18, 2018 Hotel Room meeting.  When Mr. Nerayoff called Jane Doe on November 21, 2018 to alert her that "Michael" was a con man, Mr. Nerayoff was also interested in learning about Hlady's interactions with Company 1 as he was unaware of Hlady's interactions with Company 1, particularly Alchemist's acquisition of Company 1, as Mr. Nerayoff had had reason to doubt everything that Hlady claimed he had been doing for the past six months.

36.      Clearly if there was an attempt to "forcibly" acquire Company 1 that included Jane Doe, it was being coordinated between Hlady, who had taken frequent trips to Seattle, and his alleged victim Jane Doe. Mr. Nerayoff was not involved in any forcibly takeover and this was a fact known to S/A Anderson and the government as early as November 21, 2018.

---

[25] As noted above, my February 28, 2023 request for a copy of this timeline has been ignored.

**NY SEC's November 9, 2018 "Fantasy Markets" Subpoena to Company 1**

37.    Perhaps the best evidence that Hlady was an informant, other than the extensive contact between Hlady and S/A Anderson and the lenient treatment the government has afforded him, is the fact that on November 9, 2018—the same day that Mr. Nerayoff found out Michael Peters was convicted felon Michael Hlady and terminated all contact with him—the NY Office of the SEC issued a subpoena to Jane Doe which sought information on Mr. Nerayoff's role in Company 1's ICO.

38.    On November 9, 2018 Jon Daniels[26] of the NY Office of the SEC emailed Jane Doe a subpoena, care of her attorney Harold Malkin (Exhibit 61, Company 1_ 13902).  The subpoena called for responsive documents to be provided by November 16, 2018.  Mr. Daniels had been one of the two SEC enforcement attorneys present during Mr. Nerayoff's February 27, 2018 interview[27] with S/A Anderson and AUSA Mark Bini concerning the Fantasy Market ICO. Although the subpoena sought records relating to Company 1's ICO, Mr. Nerayoff and threats allegedly made  Mr. Nerayoff and Michael Peters against Company 1 or Jane Doe, the subpoena bore the case designation "Fantasy Market (NY-9819).[28]" The SEC subpoena called for the production of:

---

[26] John Enright, who joined the prosecution team on August 5, 2022, was apparently Mr. Daniels supervisor at the NY Enforcement Office at this time as Mr. Enright served as Assistant Director in the NYC Enforcement Office from October 2018 to February 2022.

[27]  As noted in my February 13, 2023 declaration at ¶43, although Mr. Nerayoff was led to believe that the meeting was about Lucas potentially defrauding Mr. Nerayoff, the questions he recalls being asked (as confirmed by the 302 report of the interview ), were more about Mr. Nerayoff's involvement in the crypto industry than Mr. Nerayoff's giving money to Lucas to invest using Bittrex.  My February 13, 2023 declaration incorrectly identified Mr. Daniels as John Daniel based on S/A Anderson's 302 report of the interview.

[28] As noted in my February 13, 2023 Declaration, on February 27, 2018 AUSA Mark Bini served Mr. Nerayoff with a grand jury subpoena for an Eastern District of New York investigation into Fantasy Markets—the Jonathan Lucas entity (Declaration at ¶44).  On April 3, 2018 Mr. Nerayoff emailed AUSA Bini and S/A Anderson a pdf document of Mr. Nerayoff's communications with Lucas over the Signal app.  Hlady directed Mr. Nerayoff what to provide in response to the subpoena.  Mr. Nerayoff is no longer in possession of the subpoena and the government has refused our request to provide a copy.  On May 18, 2018 Mr. Nerayoff directed his General Counsel to provide a copy to the SEC, which he did by forwarding Mr. Nerayoff's subpoena response to AUSA Bini to Jon Daniels at the SEC.  On

1. A list of all purchasers of [Company 1] tokens prior to the official public token offering, including (i) name; (ii) date of purchase; (iii) number of [Company 1] tokens received; (iv) purchase amount in fiat money (e.g., U.S. dollars) or cryptocurrency; (v) any digital wallet addresses associated with the purchase.

2. All documents and communications relating to Steven Nerayoff's activities in connection with the sale of [Company 1] tokens prior to the official public token offering, including but not limited to the following:

   a. all documents identifying amounts paid to Nerayoff by [Company 1] investors prior to the official public token offering;
   b. all documents identifying amounts received from [Company 1] investors prior to the official public token offering that were retained by Nerayoff; and;
   c. all documents identifying amounts received from [Company 1] investors prior to the official public token offering that were paid by Nerayoff to [Company 1].

3. All documents and communications, including but not limited to any contemporaneous notes, concerning threats made by Michael Peters and/or Steven Nerayoff against [Company 1] or [Jane Doe].

39. As noted above, the November 9, 2018 SEC subpoena which was provided in discovery in this case is labelled Company 1_013902. Based on the Company 1 numbering scheme and the nature of the documents that followed the subpoena in the government's June 29, 2020 discovery production (ECF Document 87), it appears that 1,810 documents, totaling 23,591 pages of material, was provided by Company 1 to the SEC in response to the subpoena and then provided to the government to Mr. Nerayoff as discovery in this case.

40. Included in this material were copies of the June 20, 2018 email exchange between Jane Doe and S/A Cropcho (Exhibit 61, Company 1_013303 which appears in this series of documents following the SEC subpoena as Company 1__024353, and Company 1_024891 and the attachments to her email to S/A Cropcho appear in the pages following Company 1_024891).

---

March 14, 2023 I emailed Mr. Daniels seeking a copy of the subpoena as I was unable to obtain a copy from Mr. Nerayoff's General Counsel because of his untimely demise. As of today, Mr. Daniels has not afforded me the courtesy of a response to my request.

41.     Also included in this material that we believe were provided to the SEC are Exhibits Mr. Nerayoff previously submitted in support of his motion:  Exhibits 9 (Company 1_016983), 11 (Company 1_014702) and 14 (Company 1_014708) emails in which John Doe continued to cordially discuss how to rework the parties' July 22, 2017 agreement after both parties realized it was a product of a mutual misunderstanding.   Based on the return date of the SEC subpoena these documents were in the possession of the government as early as November 16, 2018.

42.     Also, significantly while subpoena item number 3 called for responsive documents relating to threats allegedly made by "Peters" and Mr. Nerayoff, those threats were not only already known by the Seattle Office of the FBI, but they were also outside the scope of any possible SEC Enforcement action.   This raises the question why was the New York Office of the SEC issuing a subpoena seeking specific documents already in the possession of the Seattle Office of the FBI?  Could one possible answer be that this was an attempt to hide the FBI Seattle office's apparent initiation of the investigation, as it would raise issues regarding why the resulting criminal prosecution was brought in the Eastern District of New York and not the Western District of Washington State?  Or was it another attempt to hide Hlady's role as a government informant?  Again, given the government's refusal to provide any information whatsoever about Hlady's relationship with S/A Anderson we are left to speculate.

43.     Why did the SEC send a subpoena to Jane Doe, care of her attorney, on November 9, 2018 seeking Company 1 records relating to the Company 1 ICO and Mr. Nerayoff and Hlady when Jane Doe had been fired by John Doe on September 24, 2018 and both S/A Cropcho and S/A Anderson had been in contact with her around the time she had been fired and most certainly knew that she had been fired?  Was the subpoena issued to Ms. Doe rather than Company 1 in

18

order to conceal the fact that Company 1 was the subject of an investigation by the New York Office of the SEC?

44.     Similarly, why did the SEC request information on the Storm ICO and Mr. Nerayoff under its Fantasy Market case number?  An SEC Fantasy Market investigation that was a joint one with AUSA Bini and S/A Anderson? An investigation which the government also apparently utilized Jonathan Lucas as an informant.[29]  Was this done to hide the fact that Mr. Nerayoff was the actual target of an investigation that involved Hlady providing information to the FBI relating to all Mr. Nerayoff's activities in Crypto?  As noted in my February 13, 2023 declaration, Lucas was the individual who provided Mr. Nerayoff with the contact information for S/A Anderson— shortly after Hlady said he had a contact in the FBI who might be able to provide information on Lucas' situation.

45.     Or was it because the one piece of evidence that Mr. Nerayoff provided to AUSA Bini in response to Bini's February 27, 2018 Fantasy Market grand jury subpoena duces tecum— Mr. Nerayoff's signal messages with Lucas— contained references to Mr. Nerayoff's dealings with Company 1?  Not insignificantly Hlady has spoken with S/A Anderson regarding Mr. Nerayoff's compliance with this subpoena and directed Mr. Nerayoff how to respond?[30]

46.     "The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its

---

[29] As noted in my February 13, 2023 declaration, Lucas, who had told Mr. Nerayoff that he was recording conversations for the government,  left a voice message for Mr. Nerayoff on March 25, 2018 which by any fair reading was an invitation from Lucas to engage in a conspiracy to obstruct justice (February 13, 2023 declaration at nt. 42). Lucas of course was allowed to enter into a civil settlement to an enforcement action the SEC brought in the Southern District of New York the day after Mr. Nerayoff's arrest (February 13, 2023 declaration at ¶147).

[30] The SEC subpoena again raises the question, initially posed in Mr. Nerayoff's February 13, 2023 motion, why did Washington State and not the SEC bring a securities fraud action against Company 1?  Was an SEC enforcement action bartered away to assure Company 1's cooperation in a prosecution of Mr. Nerayoff for a crime that we've shown did not occur?

obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor -- indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger v. United States*, 295 U.S. 78, 88  (1935).

47.     Indeed, Associate Justice of the United States Supreme Court (Retired), Thomas Clark, perhaps described the role of a prosecutor best when he wrote "[w]hile Attorney General of the United States I noticed an inscription that was carved in the oak panel of my anteroom and embossed in gold: "The United States wins its point whenever justice is done its citizens in its courts." *United States v. Mele*, 462 F.2d 918, 925 (2d Cir. 1972).  Like Justice Clark in the *Mele* case, we too are also constrained to note that we believe the record here does not comport with that high standard.

48.     Mr. Nerayoff was arrested 3 years, 5 months and 10 days ago on charges that were entirely false and we believe the facts in support of our motion establish that the government knew that the allegations were false.   For every one of those 1,259 days Mr. Nerayoff has had to suffer from the stigma of an indictment which led even close members of his family to believe he must be guilty, because the FBI and the United States Attorney's Office only prosecute guilty people.

49.     Mr. Nerayoff has been unable to conduct business, his passport was taken from him, he has had restrictions on his right to travel-- even inside the United States-- and his health has deteriorated under the stress of the indictment, threats to supersede the indictment to bring other similarly baseless charges, and threats to imprison him unless he cooperate in what he

believed was the government's witch hunt against the crypto industry. Mr. Nerayoff's children have suffered, both from seeing their father under the stress of a prosecution that potentially could have sent him to prison for many years for a crime that he didn't commit, and as a result of their being labelled the children of an extortionist, and both Mr. Nerayoff and his children lost unknown hours of time that they would have spent together but for Mr. Nerayoff's need to address this case.

50.     While we certainly join in the government's motion to dismiss the indictment with prejudice, we vehemently object to the government's couching the dismissal in terms of an inability to prove his guilt beyond a reasonable doubt, as the overwhelming, irrefutable evidence establishes he was actually innocent and the indictment was based on a material falsehoods and perjury that the government knowingly advanced. Instead of taking responsibility for its actions, the government's opposition is one last attempt to its their three-and-a-half-year prosecution of an innocent man.

**Conclusion**

51.     For all these reasons and the arguments presented in all our papers in support, Mr. Nerayoff requests that the Court grant his motion to dismiss the indictment with prejudice, or in the alternative dismiss the indictment with prejudice on the government's motion but with an objection as to the basis. The government surely cannot prove his guilt beyond a reasonable doubt, but that is not because of any evidentiary deficiency, because he is actually innocent.


     Dated: Port Washington, New York
          March 21, 2012




                                           By: /s/ Michael A. Scotto

Michael A. Scotto