UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------
UNITED STATES OF AMERICA,

           - against -                                        **MEMORANDUM & ORDER**
                                                                   20-CR-008 (MKB)

STEVEN NERAYOFF,

                            Defendant.
-------------------------------------------------------------------
MARGO K. BRODIE, United States District Judge:

        On January 10, 2020, a grand jury returned an Indictment against Defendant Steven Nerayoff, charging him with one count of Hobbs Act extortion conspiracy, two counts of Hobbs Act extortion in violation of 18 U.S.C. §§ 1951(a), 2 and § 3551 et seq., and one count of conspiracy to transmit interstate communications with intent to extort in violation of 18 U.S.C. § 875(d).[1]  (Indictment ¶¶ 1–4, Docket Entry No. 30.)

        On February 13, 2023, Nerayoff moved to dismiss the Indictment with prejudice and for other relief, arguing the Court should dismiss the Indictment pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure because it is based upon materially false testimony submitted to the grand jury.  (Def. Nerayoff Mot. to Dismiss ("Nerayoff Mot.") 1, Docket Entry No. 105.)  On March 20, 2023, the Government opposed Nerayoff's motion to dismiss, but submitted its own motion to dismiss with prejudice.  (Gov't Mem. of Law in Opp'n to Nerayoff Mot. ("Gov't Opp'n"), Docket Entry No. 112.)

---

[1] The grand jury also indicted Defendant Michael Hlady, charging him with the same crimes.  On April 5, 2021, Hlady pleaded guilty before the Court to Hobbs Act Extortion Conspiracy in violation of 18 U.S.C. §§ 1951(a) and 3551 et seq.  (*See* Change of Plea Hearing Minute Entry dated April 5, 2021.)  Sentencing is currently scheduled for June 29, 2023.

On March 28, 2023, Nerayoff filed a motion to vacate the protective order he signed prior to receiving discovery in the case, arguing that he should be allowed to retain copies of the discovery material provided by the Government for use in a subsequent civil proceeding. (Nerayoff Mot. to Vacate Protective Order ("Nerayoff Mot. to Vacate"), Docket Entry No. 117.)

For the reasons discussed below, the Court denies Nerayoff's motion to dismiss, grants the Government's motion to dismiss the Indictment with prejudice, and denies Nerayoff's motion to vacate the protective order.

## I. Background

### a. Factual background

Nerayoff, a resident of Great Neck, New York, located within the Eastern District of New York,[2] (Compl. ¶ 3, Docket Entry No. 1), was an attorney, founder, and Chief Executive Officer of Alchemist, LLC ("Alchemist"), a company that purported to be a "leading consultancy, accelerator and investment firm for high-potential blockchain companies." (*Id.*) Nerayoff also controlled the Maple Ventures LLC ("MV") and the SDN LTD ("SDN") entities. (*Id.*) Hlady, also known as "Michael Peters," was a resident of Hicksville, New York and was hired by Nerayoff as a consultant to Alchemist and to perform functions similar to a Chief Operations Officer. (*Id.* ¶ 4.) Hlady used the alias "Michael Peters" and "[a]t various times, he also falsely claimed to be a former member of the United States military and a former government agent" who worked for various federal law enforcement agencies. (*Id.*) Company 1 is a mobile-based business that "specializes in generating user traffic to clients' products by issuing rewards in the form of cryptocurrency tokens" and is headquartered in Seattle, Washington. (*Id.* ¶ 5.)

---

[2] Unless otherwise specified, the facts are taken from the Complaint filed in support of an application for arrest warrants. (Compl. ¶¶ 1–2.)

On or about July 22, 2017, John Doe and Jane Doe, respectively Chief Executive Officer and Chief Operating Officer of Company 1, signed an agreement with MV "to revise Company 1's whitepaper," "add advisors and strategic partnerships for Company 1 to ensure a successful crowdsale,"[3] "source and curate pre-seed funding from 'strategic partners in the blockchain community,'" among other things (the "July 2017 Agreement"). (*Id.* ¶ 13.) The Complaint alleges that after MV and Company 1 signed the July 2017 Agreement, Defendants "took various actions to threaten John Doe, Jane Doe, and Company 1 in order to extract additional compensation without promising or rendering any additional services." (*Id.* ¶ 14.)

Company 1's crowdsale was scheduled to begin on November 7, 2017, but during the week leading up to it, Nerayoff and a co-conspirator "demanded that Company 1 agree to let MV keep 30,000 ETH (worth approximately $8.75 million on November 7, 2017) that it had been holding from the pre-sales."[4] (*Id.* ¶¶ 15, 17.) Nerayoff allegedly threatened to "sabotage the crowdsale, generate negative press for Company 1 and use his contacts with influential people to 'destroy' Company 1." (*Id.* ¶ 17.)

On or about November 6, 2017, Nerayoff "sent an email to John Doe and Jane Doe, with the subject line, 'Please sign ASAP.' and attached two agreements that sought to provide additional compensation to Nerayoff." (*Id.* ¶ 18.) The next day, Jane Doe and Nerayoff executed the two agreements (the "November 2017 Agreements"). (*Id.*) The first agreement provided that Nerayoff would be entitled to "1.35 billion of Company 1's tokens and 30,000

---

[3] A "crowdsale" or "Initial Coin Offering" ("ICO") is a "fundraising event during which an entity offers participants a unique 'coin' or 'token'" traded on a blockchain or cryptographically secured ledger for consideration. (Compl. ¶ 5.)

[4] "ETH" refers to "Ether" a "virtual currency" also known as a "cryptocurrency." (Compl. ¶ 8.)

ETH," in addition to "900 million Company 1 tokens two years after the token sale," among other things. (*Id.* ¶ 19.) The second agreement provided that "Company 1 '[d]irects Nerayoff to transfer [30,000 ETH or the equivalent in cryptocurrencies] to the persons listed on Schedule A hereof upon completion of the Crowdsale," but the only individual or entity listed on Schedule A was SDN. (*Id.* ¶ 20 (alterations in original)).

On or about and between November 7, 2017 and December 8, 2017, Company 1's crowdsale "raised approximately another 20,000 ETH for Company 1," for a total of approximately 75,677 ETH during the pre-sale and crowdsale periods. (*Id.* ¶ 21.) Pursuant to the July 2017 Agreement, Nerayoff would have received approximately 17,027 ETH, but as a result of the November 2017 Agreements, Nerayoff kept 30,000 ETH. (*Id.*) Nerayoff also "demanded 1 billion of the unsold tokens" from the crowdsale "before revising his demand to 350 million tokens." (*Id.* ¶ 22.)

In approximately March of 2018, Nerayoff allegedly "demanded that Company 1 give him a purported loan for 10,000 ETH" and introduced Hlady to John Doe and Jane Doe as his "'operations guy,' whom they should view as the president of Alchemist." (*Id.* ¶ 23.) Nerayoff told John Doe and Jane Doe that Hlady was a "former government agent" and Hlady told Jane Doe that he had "shot at and had killed people," "had 'taken down' a head of state," and "had been a part of the Irish Republican Army, the National Security Agency, the Central Intelligence Agency and the Federal Bureau of Investigation." (*Id.*)

Between March 20, 2018 and March 23, 2018, Jane Doe visited Defendants at Nerayoff's home in Great Neck. (*Id.* ¶ 24.) On or about March 22, 2018, Defendants allegedly walked into the room where Jane Doe was sleeping and "threatened to 'destroy' both her and Company 1 if Company 1 did not provide [Nerayoff] with money and virtual currency." (*Id.* ¶¶ 24–25;

4

Indictment ¶ 5(a).) On other occasions, Defendants allegedly "made additional threats to Jane Doe and John Doe" including Hlady telling Jane Doe he "was aware of her work-related issues at a different company, and knew where her child went to school." (Compl. ¶ 26.) Defendants also "threatened to expose Company 1 to potential litigation." (*Id.*) On or about March 27, 2018 or March 28, 2018, Hlady sent Jane Doe a message while he was at John F. Kennedy International Airport regarding the loan and demanded she "fix this by the time [his flight] land[s] or I promise I will destroy your community . . . we will go public with [Nerayoff's] holding . . . we will sell and get everyone we know to sell . . . we will sue you . . . a story will be written about [Company 1]" among other things. (*Id.* ¶ 27.) Between March 28, 2018 and April 1, 2018, John Doe "instructed a Company 1 employee to transfer 10,000 ETH" to Nerayoff as a loan in response to these threats. (*Id.* ¶ 28.)

Nerayoff allegedly "also made clear to Jane Doe that he wanted to acquire Company 1." (*Id.* ¶ 29.) On or about May 10, 2018, Nerayoff wrote an email to Hlady and a co-conspirator stating, "[w]e are acquiring them and going to make them f[\*\*]king rich as hell and [Jane Doe] will pay off everything and get what she would never have without us so tell her to chill out. We will blow them out as a protocol and they will be part of Alchemist." (*Id.*) On approximately May 15, 2018, John Doe and Jane Doe attended a meeting with Defendants and a co-conspirator in New York City during which Nerayoff allegedly "confirmed that he knew of [Hlady's] threat to 'destroy' Company 1," and "one of [Nerayoff's] employees stated that they were running an 'intervention' with [Nerayoff], and that with exception of [Nerayoff], they were not 'ganging up' on Jane Doe and John Doe." (*Id.* ¶ 30.)

### b. Procedural background

On October 18, 2019, Magistrate Judge Vera M. Scanlon approved a protective order in this case on consent of the Government, Nerayoff, and Hlady (the "Protective Order"). (Protective Order, Docket Entry No. 21.) The Protective Order provided that "any information produced in [this] case that contains the name or voice of the victims (referred to as John Doe and Jane Doe in the complaint) or that could be used to discern the victims' identities, including but not limited to audio recordings (as well as draft transcripts thereof), reports and affidavits (collectively, the "Protected Materials") may not be disseminated beyond the defendants, their attorneys and their attorneys' legal staff." (*Id.* at 1.) In addition, the Protective Order provided that "defendants, their attorneys and their attorneys' legal staff shall not make additional copies of the Protected Materials or show the Protected Materials to any other person," and "the Protected Materials shall be returned to the government at the conclusion of this case." (*Id.* at 1–2.)

On January 10, 2020, a grand jury returned an Indictment against Nerayoff, charging him with one count of Hobbs Act extortion conspiracy, two counts of Hobbs Act extortion in violation of 18 U.S.C. §§ 1951(a), 2 and § 3551 et seq., and one count of conspiracy to transmit interstate communications with intent to extort in violation of 18 U.S.C. § 875(d). (Indictment ¶¶ 1–4.) According to the Indictment, the charges largely stem from two related series of transactions. First, from in or about June of 2017 to November of 2018, Nerayoff "together with others, did knowingly and intentionally conspire to obstruct, delay and affect commerce . . . by extortion . . . to obtain . . . virtual currency" from victims John Doe and Jane Doe with their consent, which consent was induced through the use of "actual or threatened force, violence and fear." (Indictment ¶ 1.) Second, from in or about between October 2017 and November 7, 2017

6

and in or about March 2018, Nerayoff "did knowingly and intentionally obstruct, delay and affect commerce . . . by extortion" and obtained virtual currency from John Doe and Jane Doe "with their consent . . . induced by wrongful use of actual or threatened force, violence and fear." (*Id.* ¶¶ 2–3.) In addition, from in or about March 22, 2018 and March 28, 2018, Nerayoff conspired with the intent to extort from John Doe, Jane Doe, and Company 1[5] "money and one or more things of value to transmit in interstate and foreign commerce" communications containing "threats to injure the property and reputation of John Doe, Jane Doe and Company 1." (*Id.* ¶ 4.)

On February 13, 2023, Nerayoff moved to dismiss the Indictment with prejudice arguing the Indictment should be dismissed pursuant to Rule 12(b) because it is based upon materially false testimony submitted to the grand jury. (Nerayoff Mot. 1; Mem. in Supp. of Nerayoff Mot. ("Nerayoff Mem."), Docket Entry No. 105-47.) In the alternative, Nerayoff argues that should the Court decline to dismiss the Indictment with prejudice, the Court should "order the release of grand jury testimony relating to evidence presented relating to the alleged extortion," and "compel the government to produce the information sought by [Nerayoff] to allow him to renew and supplement the motion to dismiss the indictment based on a review of the grand jury testimony." (Nerayoff Mem. 1.) Nerayoff attached to his motion an affidavit from his attorney based on his attorney's "review of material provided to date by the government in discovery, material provided to [Nerayoff] by way of subpoena, conversations with relevant parties, and a review of video recordings, messages and emails between [Nerayoff] and Jane Doe, John Doe and other parties described herein." (Decl. of Michael A. Scotto, Esq. ("Scotto Decl.") ¶ 2,

---

[5] The Indictment notes that the identities of John Doe, Jane Doe, and Company 1 are known to the grand jury.

annexed to Nerayoff Mot., Docket Entry No. 105-1.) Nerayoff also attached forty-five exhibits in support of his motion.

On March 20, 2023, the Government opposed Nerayoff's motion to dismiss, but submitted its own motion to dismiss with prejudice on the basis that "the government is unable to prove the charges in the Indictment beyond a reasonable doubt." (Gov't Opp'n 20.) On March 21, 2023, Nerayoff submitted a reply affidavit from his attorney in support of his motion to dismiss in addition to more exhibits. (Decl. of Michael A. Scotto, Esq. ("Scotto Reply Decl."), Docket Entry No. 113.)

On March 28, 2023, Nerayoff filed a motion to vacate the Protective Order, arguing that he should be able to retain copies of the discovery material provided by the Government for use in a subsequent civil proceeding.[6] (Nerayoff Mot. to Vacate.) On April 10, the Government opposed Nerayoff's motion to vacate the Protective Order, (Gov't Opp'n to Nerayoff Mot. to Vacate, Docket Entry No. 120), and Nerayoff filed his reply on April 12, (Nerayoff Reply in Supp. of Mot. to Vacate, Docket Entry No. 121).

## II. Discussion

### a. The Court denies Nerayoff's motion to dismiss the Indictment

Nerayoff argues that although he is "not privy to what evidence the grand jury received," "the road map laid out by the government leads to the inescapable conclusion that each of the counts of the indictment rest on false and perjured testimony." (Nerayoff Mem. 6.) In support, Nerayoff relies on *United States v. Basurto*, a Ninth Circuit case holding that a defendant's due process rights are violated "when a defendant has to stand trial on an indictment which the

---

[6] Nerayoff also filed a motion to amend the Indictment to reflect the true names of the alleged victims, (Nerayoff Mot. to Vacate), but has since withdrawn his request to amend the Indictment, (Nerayoff Reply in Supp. of Mot. to Vacate 6, Docket Entry No. 121).

8

government knows is based partially on perjured testimony, when the perjured testimony is material." (*Id.* at 7 (quoting *United States v. Basurto*, 497 F.2d 781, 785–86 (9th Cir. 1974)).) Nerayoff argues that "it is uncontroverted that prior to obtaining the Indictment the government had extensive evidence in its possession that [Nerayoff] was entitled to billions of Company 1's tokens." (*Id.* at 9.)

The Government argues that Nerayoff "does not claim that the Indictment fails to track the language of the charged statutes or that he has not been apprised of the approximate time and place of the relevant conduct because he cannot" and such a failing bars his claim. (Gov't Opp'n 7.) In support, the Government argues that "Nerayoff has not — and cannot — point to any real evidence that a government grand jury witness (who is yet to be identified) knowingly presented materially false testimony to the grand jury, or, even if false testimony was presented, that it would have substantially influenced the grand jury's decision to indict." (*Id.*) Instead, the Government argues, Nerayoff is speculating that false testimony must have been presented to the grand jury "in light of his own interpretation of the evidence and incorrect assumptions about what material the government had access to and when," but that the Court should reject this attempt to try the case because that is the "province of the jury." (*Id.* at 7–8.) In addition, the Government argues that *Basurto* is easily distinguished because in that case, a grand jury witness admitted to committing perjury and told the Government which is not the case here. (*Id.* at 8.)

Pursuant to Rule 12(b)(3)(A) of the Federal Rules of Criminal Procedure, a defendant may move to dismiss an indictment for various defects, including "a defect in instituting the prosecution," such as "an error in the grand-jury proceeding." Fed. R. Crim. P. 12(b)(3)(A)(v); *see also United States v. O'Brien*, 926 F.3d 57, 82 (2d Cir. 2019). On a Rule 12 motion, "a district court can 'make factual determinations in matters that do not implicate the general issue

9

of a defendant's guilt'" but it "cannot resolve 'a factual dispute that is inextricably intertwined with a defendant's potential culpability,' as that is a role reserved for the jury." *United States v. Aiyer*, 33 F.4th 97, 116 (2d Cir. 2022) (quoting *United States v. Sampson*, 898 F.3d 270, 281 (2d Cir. 2018)). "In other words, 'although a judge may dismiss a civil complaint pretrial for insufficient evidence [on a motion for summary judgment], a judge generally cannot do the same for a federal criminal indictment.'" *Id.* at 117 (quoting *Sampson*, 898 F.3d at 280); *United States v. Kimmons*, No. 16-CR-63V, 2018 WL 6729255, at *2 (W.D.N.Y. Nov. 5, 2018), *report and recommendation adopted*, No. 16-CR-63, 2018 WL 6241307 (W.D.N.Y. Nov. 29, 2018) ("Thus, while a court can dismiss an indictment pretrial for legal deficiencies, it cannot invade the province of the ultimate finder of fact." (citing *United States v. Hoskins*, 73 F. Supp.3d 154, 161 (D. Conn. 2014)). Other than a Rule 12 motion, "[a] defendant has no right to judicial review of a grand jury's determination of probable cause to think a defendant committed a crime." *Kaley v. United States*, 571 U.S. 320, 333 (2014). "Unless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial . . . the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment." *United States v. Perez*, 575 F.3d 164, 166–67 (2d Cir. 2009). "To hold otherwise, *i.e.*, if indictments could be challenged pretrial on the ground of inadequate [or] incompetent evidence, a defendant would be entitled to a kind of preliminary trial to determine the competency and adequacy of the evidence before the grand jury, which would contradict the rule that an indictment need not contain all of the government's anticipated evidence at trial, but must do little more than track the language of the statute charged and state the approximate time and place of the alleged crime." *Kimmons*, 2018 WL 6729255, at *2. The Second Circuit has explicitly rejected the proposition that "grand jury testimony that has merely been thrown open to suspicion by

10

postindictment events is an invalid basis for an indictment" because "[s]uch a rule of law would necessitate independent judicial review of the credibility of grand jury witnesses, an exercise that would seriously infringe upon the traditional independence of the grand jury." *United States v. Guillette*, 547 F.2d 743, 753 (2d Cir. 1976); *see also United States v. McGrady*, No. 18-CR-138, 2021 WL 4846221, at *3 (W.D.N.Y. Oct. 18, 2021) (same); *United States v. Bellomo*, 263 F. Supp. 2d 557, 561 (E.D.N.Y. 2003) (same).

At this stage of the proceedings, the Court cannot consider the factual evidence underlying the Indictment. To do so would improperly place the Court in the role of the jury. *See, e.g.*, *Aiyer*, 33 F.4th at 117 (affirming a district court's refusal to assess the defendant's proffered evidence on a Rule 12 motion pretrial); *Kimmons*, 2018 WL 6729255, at *2 (denying a Rule 12(b) motion pretrial where defendant "speculat[ed] that the government will not be able to meet its burden of proof at trial").

Moreover, even if it were proper for the Court to consider the factual evidence set forth by Nerayoff, Nerayoff provides no evidence that a Government grand jury witness presented materially false testimony to the grand jury, or that even if false testimony was presented, it would have influenced the grand jury's decision to indict. In *Basurto*, a grand jury witness testified about the defendants' activities in the conspiracy. *Basurto*, 497 F.2d at 784. Before trial began, the witness informed the prosecutor that "he had committed perjury before the grand jury in important respects," and that "all his grand jury testimony relating to his knowledge of [defendants'] activities in the conspiracy . . . was untrue." *Id.* The prosecutor informed opposing counsel but did not notify the court or the grand jury. During his opening statement, the prosecutor made reference to the witness's perjury, but sought to minimize it. The Ninth Circuit held that the defendant's due process rights were violated because he had to "stand trial

11

on an indictment which the government knows is based partially on perjured testimony, when the perjured testimony is material, and when jeopardy has not attached" and the prosecutor "did not take appropriate action to cure the indictment upon discovery of the perjured grand jury testimony." *Id.* at 785, 787.  In addition, the Ninth Circuit held that whenever a prosecutor learns of "any perjury committed before the grand jury, he is under a duty to immediately inform the court and opposing counsel — and, if the perjury may be material, also the grand jury — in order that appropriate action may be taken." *Id.* at 785–86.  However, *Basurto* is inapposite to the case before the Court, since there is no evidence that the Government is aware of perjured testimony before the grand jury or that any perjured testimony was material.

      The other cases relied on by Nerayoff are also inapplicable to the facts before the Court. In *Guillette*, the indictment returned against the defendants was based in substantial part on the testimony of a key government witness in the first trial.  *Guillette*, 547 F.2d at 752.  The witness later "admitted [to] giving false testimony during the trial," which led to the convictions from the trial being vacated and a new trial ordered, "but the original indictment was left undisturbed." *Id.*  Defendants argued that the prosecutor was under a duty to seek a new indictment untainted by the admittedly false testimony, but the court held that even though the government witness recanted his perjurious trial testimony, there was "no evidence" that he "actually committed perjury during his grand jury appearance."  *Id.* at 752–53.  The court "decline[d] to adopt the proposition that grand jury testimony that has merely been thrown open to suspicion by postindictment events is an invalid basis for an indictment."  *Id.* at 753.  *Guillette* is inapposite because the indictment in that case was not dismissed and, in any event, no witness has recanted any perjurious testimony.

      The court in *United States v. Goldman*, 451 F. Supp. 518 (S.D.N.Y. 1978) adopted the

12

reasoning of *Basurto* in a factually similar case involving a prosecutor who was notified by the grand jury witness that they had lied before the grand jury with respect to material evidence demonstrating the defendant's guilt.  *Goldman* is also inapplicable to the facts before the Court because no Government witness has admitted to committing perjury before the grand jury.  *See also United States v. Torres*, 901 F.2d 205, 232 (2d Cir. 1990) (declining to apply *Basurto* and dismiss the indictment "given the absence of any claims of prosecutorial misconduct or perjury with respect to the grand jury proceedings"), *abrogated on other grounds by United States v. Marcus*, 628 F.3d 36, 41 (2d Cir. 2010).

Accordingly, the Court denies Nerayoff's motion to dismiss the Indictment.

  **b. The Court grants the Government's motion to dismiss**

The Government moves to dismiss the Indictment with prejudice pursuant to Rule 48(a) of the Federal Rules of Criminal Procedure.  The Government concedes that it "is unable to prove the charges in the Indictment beyond a reasonable doubt." (Gov't Opp'n 20.)  In support, the Government bases its motion on "material exculpatory evidence" that it obtained "well after return of the Indictment," "subsequent investigation of that evidence," "present inability to admit other evidence at trial, which the government views as essential to proving its case-in-chief," and "substantial likelihood that the government's inability to admit such evidence will not improve with time."  (*Id.*)

Pursuant to Rule 48(a) of the Federal Rules of Criminal Procedure, the Government "may, with leave of court, dismiss an indictment, information, or complaint." Fed. R. Crim. P. 48(a). "The principal object of the 'leave of court' requirement is apparently to protect a defendant against prosecutorial harassment, *e.g.*, charging, dismissing, and recharging, when the Government moves to dismiss an indictment over the defendant's objection." *United States v.*

13

*Blaszczak*, 56 F.4th 230, 238 (2d Cir. 2022) (quoting *Rinaldi v. United States*, 434 U.S. 22, 29–30 n.15 (1977)). However, the "Rule has also been held to permit the court to deny a Government dismissal motion to which the defendant has consented if the motion is prompted by *considerations clearly contrary to the public interest*." *Id.*; *see also United States v. Pimentel*, 932 F.2d 1029, 1033 n.5 (2d Cir. 1991) (limiting denial of Rule 48(a) motions to cases in which dismissal is "clearly contrary to manifest public interest" (quoting *United States v. Cowan*, 524 F.2d 504, 513 (5th Cir. 1975))). "The government may elect to eschew or discontinue prosecutions for any of a number of reasons. Rarely will the judiciary overrule the Executive Branch's exercise of these prosecutorial decisions." *Blaszczak*, 56 F.4th at 238.

Because Nerayoff does not contest dismissal of the Indictment and the Court finds no reasons that are "clearly contrary to the public interest" in granting the dismissal, the Court grants the Government's motion to dismiss the Indictment with prejudice.[7]

### c. The Court denies Nerayoff's motion to vacate the Protective Order

Nerayoff seeks to vacate the Protective Order and retain copies of discovery materials the Government provided and makes several arguments in support. (Nerayoff Mot. to Vacate.) First, that the Government has already unmasked the victims by providing information that made it possible for reporters to discover who the alleged victims are. (*Id.* at 3–5.) Second, that he seeks to use these documents for a proper purpose, specifically that he would like to retain these records for "use in appropriate litigation" and that he has "abided by both the letter and the spirit of the protective order." (Nerayoff Reply in Supp. of Mot. to Vacate 3.) Third, that the privacy interests of the alleged victims are not at issue because the alleged victims are not actual victims.

---

[7] Because the Court dismisses the Indictment, the Court denies Nerayoff's motions in the alternative for disclosure of the grand jury minutes and to compel the Government to produce additional evidence.

(*Id.* at 3–4.)  Fourth, that the protected materials do not reveal investigative techniques or identify agents.  (*Id.* at 4.)  Fifth, the risk of reputational harm to third parties is nonexistent because the third party alluded to in the discovery materials was not covered by the Protective Order and not named in the transcript of the recorded meeting.  (*Id.* at 4–5.)  Sixth, that he has a compelling need for these documents to prove his false arrest claim and he has established a compelling need pursuant to the Second Circuit's test in *SEC v. TheStreet.com*, 273 F.3d 222, 229 (2d Cir. 2001).  (*Id.* at 5–6.)  Seventh, although Nerayoff withdraws his motion to amend the Indictment, he requests that the Court unseal the sealed exhibits submitted in support of his February 13 motion to dismiss.  (*Id.* at 6–7; Exs. 1–57 annexed to Scotto Decl., Docket Entry Nos. 105-2 to 105-46.)  Nerayoff also requests that the Court unseal the motion papers and decision relating to the subpoena the Court issued in connection with Nerayoff's *ex parte* request.  (Nerayoff Reply in Supp. of Mot. to Vacate 7.)

      The Government opposes Nerayoff's motion on the grounds that it is legally baseless and seeks relief that would expose third parties and victims to an unreasonable invasion of privacy.  (Gov't Opp'n to Mot. to Vacate.)  The Government makes several arguments in support of its opposition.  First, that Nerayoff does not cite any authority for the proposition that he is permitted to engage in such an unfettered use of protected criminal discovery material in a subsequent civil action.  (*Id.* at 2–4.)  Further, under Rule 16 of the Federal Rules of Criminal Procedure, discovery materials should be exchanged privately between the parties and not disclosed publicly.  (*Id.*)  Nerayoff's argument that there was never good cause for the Protective Order fails because he consented to the Protective Order in the first place.  (*Id.*)  Second, that Rule 16 does not confer to Nerayoff a property interest in materials produced to him.  (*Id.* at 4.)  Third, vacating the Protective Order would implicate the privacy interests of the alleged victims

15

and hundreds of third parties who are implicated in Company 1's bookkeeping and accounting records, investor info, and customer details.  (*Id.* at 4–5.)  Fourth, the protected materials also include at least one conversation involving a third-party individual which would implicate in detail their presence and participation in activities that were the subject of a Government investigation and criminal prosecution.  (*Id.*)  Fifth, vacating the order may chill victims' willingness to report crimes.  (*Id.* at 5.)  Sixth, the Protective Order does not prevent Nerayoff from requesting discovery of these documents in other proceedings including civil proceedings.  (*Id.*)

The Protective Order was issued by Judge Scanlon with the consent of the Defendants and prohibited dissemination of materials produced by the Government that contained the name or voice of the victims.  Pursuant to the terms of the Protective Order, Nerayoff agreed to return all the protected materials to the Government at the conclusion of the case.  The Government is correct that Nerayoff has no right to retain the discovery information for use in a subsequent civil proceeding, *see United States v. Smith*, 985 F. Supp. 2d 506, 519 (S.D.N.Y. 2013) ("While protective orders related to judicial documents and criminal proceedings are subject to constitutional and common law scrutiny, protective orders related to discovery are not.  This is because experience and logic show that there is no right of access to discovery materials."), and because Nerayoff signed the Protective Order and agreed to return the discovery materials, there is even less reason to allow him to keep them, *see United States v. Anderson*, 799 F.2d 1438, 1441 (11th Cir. 1986) ("Discovery, whether civil or criminal, is essentially a private process because the litigants and the courts assume that the sole purpose of discovery is to assist trial preparation.  That is why parties regularly agree, and courts often order, that discovery information will remain private."); *United States v. Kerik*, No. 07-CR-1027, 2014 WL 12710346,

16

at *1 (S.D.N.Y. July 23, 2014) ("There is no presumptive right of public access to documents exchanged by parties during discovery and not considered by the [c]ourt."). In addition, Rule 16 does not provide Nerayoff with a property interest in the materials the Government produced. *See United States v. Maniktala*, 934 F.2d 25, 28 (2d Cir. 1991) ("To the extent any Rule 16 property interest in [company timesheets] exists, we find it belongs to the corporation rather than defendant," even where defendant was president of the corporation's parent company); *see also United States v. Garcia*, 406 F. Supp. 2d 304, 305 (S.D.N.Y. 2005) (no property interest conferred to defendant by production of Jencks Act material).

The only case Nerayoff cites in support of his argument that he has a compelling need for the discovery materials is inapposite.[8] (Nerayoff Reply in Supp. of Mot. to Vacate 6 (citing *TheStreet.com*, 273 F.3d at 229).) In *TheStreet.com*, the SEC brought a civil enforcement action against stockbrokers and brokerage officials. *TheStreet.com*, 273 F.3d at 229. The defendants brought a third-party claim against the New York Stock Exchange, Inc. ("NYSE"). An online business news service, theStreet.com, sought access to previously sealed transcripts of NYSE officials' depositions as an intervenor-plaintiff. The district court granted the motion and the Second Circuit affirmed. The Second Circuit held that no presumption of public access attached to the transcripts because they were not "judicial documents," but that the strong presumption against public disclosure of sealed records was inapplicable given the presence of interested third parties who did not agree to abide by the Protective Order at depositions. This case is

---

[8] At a status conference held on May 2, 2023, counsel for Nerayoff conceded that there is no precedent or case law that supports his argument that the Court should permit him to retain the discovery materials.

inapplicable because Nerayoff explicitly agreed to abide by the Protective Order.[9]  Therefore, Nerayoff has not demonstrated a compelling need to retain copies of the discovery material.[10]

### III. Conclusion

For the foregoing reasons, the Court denies Nerayoff's motion to dismiss, and grants the Government's motion to dismiss the Indictment with prejudice.  The Court also denies Nerayoff's motion to vacate the Protective Order.

Dated: May 5, 2023
    Brooklyn, New York

SO ORDERED:

   /s/ MKB
MARGO K. BRODIE
United States District Judge

---

[9]  In addition, *TheStreet.com* involved a unique situation where the confidential testimony related to the interaction between the SEC and NYSE, two quasi-governmental agencies. *TheStreet.com*, 273 F.3d at 227.

[10]  The Court grants in part and denies in part Nerayoff's request in the alternative to unseal the exhibits submitted in support of his motion to dismiss.  To the extent that the exhibits were disclosed by the Government through discovery, those exhibits are subject to the Protective Order barring their release.  To the extent that the exhibits were provided by Nerayoff, the parties are directed to confer and propose redactions to the exhibits for unsealing.  The Court also grants Nerayoff's request to unseal the motion papers and decision related to the *ex parte* subpoenas the Court issued.  The parties are directed to confer and propose redactions to the Court's July 2022 decision, (July 2022 Decision, Docket Entry No. 89), and any motion papers related to the *ex parte* subpoena requests.